### STATE OF NORTH CAROLINA v. BUCK JUNIOR GOODMAN

No. 46

(Filed 4 September 1979)

1. **Homicide § 28.6— defense of intoxication—instruction not required**

   The trial court in a first degree murder case was not required to charge the jury upon the defense of intoxication, though there was evidence that defendant had been drinking prior to commission of the crime, since there was no evidence which showed that defendant's capacity to think and plan was affected by drunkenness.

2. **Homicide §§ 25, 31— first degree murder—issues of premeditation and deliberation and felony-murder—requiring jury to specify basis of verdict—use of written verdict proper**

   Where an indictment for murder and the evidence at trial would support a guilty verdict upon the theory of premeditation and deliberation or upon the application of the felony-murder rule, it was appropriate for the trial court to require the jury to specify in its verdict the theory upon which they found defendant guilty of first degree murder so that defendant could be properly sentenced; moreover, G.S. 15A-1237 authorizes the use of a written verdict setting out the permissible verdicts recited by the judge in his instructions, in this case, guilty by reason of the felony-murder rule or guilty by reason of premeditation and deliberation, and by using this procedure the trial court did not confuse the jury or inadvertently express an opinion as to defendant's guilt.

3. **Criminal Law § 126.2— inquiry to clarify jury's verdict—no coercion of verdict**

   The trial court in a first degree murder case did not err in questioning the jury about their verdict for purposes of clarity rather than sending them back for further deliberations, and the court's questions to the jury did not

1

suggest a desired verdict where the clerk asked the jury whether defendant was guilty of first degree murder by premeditation and deliberation or guilty of first degree murder by the felony-murder rule; the jury foreman answered yes; and the court's questions were asked simply to resolve that ambiguity and to determine the basis for the verdict.

4. **Criminal Law § 138.4; Homicide § 31.1— first degree murder—premeditation and deliberation and felony-murder rule as basis—separate punishment for underlying felonies proper**

Where defendant was found guilty of first degree murder based upon premeditation and deliberation and the felony-murder rule, the trial court could disregard the felony-murder basis of the homicide verdict and impose additional punishment upon defendant for the underlying crimes of armed robbery and kidnapping.

5. **Criminal Law § 135.4— first degree murder—sentencing hearing—aggravating circumstance of prior felony conviction**

In order for the trial court to instruct the jury during the sentencing phase of trial on the aggravating circumstance of G.S. 15A-2000(e)(3),there must be evidence that defendant had been convicted of a felony, the felony for which he was convicted involved the "use or threat of violence to the person," and the conduct upon which this conviction was based was conduct which occurred prior to the events out of which the capital felony charge arose.

6. **Criminal Law § 135.4— first degree murder—sentencing hearing—aggravating circumstance of robbery or kidnapping**

Instruction during the sentencing phase of trial on the aggravating circumstance of G.S. 15A-2000(e)(5), that the capital felony "was committed while the defendant was engaged . . . in the commission of . . . any robbery . . . [or] kidnapping" or other enumerated felony, is appropriate only when defendant is convicted of first degree murder upon the theory of premeditation and deliberation.

7. **Criminal Law § 135.4— first degree murder—sentencing hearing—aggravating circumstance of especially heinous, atrocious or cruel crime**

In order for the trial court to instruct the jury during the sentencing phase of trial on the aggravating circumstance of G.S. 15A-2000(e)(9), that the "capital felony was especially heinous, atrocious, or cruel," there must be evidence that the brutality involved in the murder in question exceeded that normally present in any killing. The trial court properly instructed on this circumstance where the evidence revealed that decedent was shot several times and then cut repeatedly with a knife; still living, he was placed in the trunk of a car where he remained for several hours; his struggle to escape from the trunk could be heard; decedent, still in the trunk, was then driven into another county where he was taken from the car; and he was placed upon the ground with his head resting upon a rock and then shot twice through the head.

8. **Criminal Law § 135.4— first degree murder—sentencing hearing—aggravating circumstance of eliminating witness**

In order for the trial court to instruct the jury during the sentencing phase of trial on the aggravating circumstance of G.S. 15A-2000(e)(4), there

State v. Goodman

must be evidence from which the jury can infer that at least one of the purposes motivating the killing was defendant's desire to avoid subsequent detection and apprehension for his crime, and the mere fact of death is not enough to invoke this factor. Evidence in this case was sufficient for the jury to infer that defendant killed his victim to avoid or prevent his arrest where there was testimony that after the victim was shot and cut, but before he was killed, defendant stated that he "was afraid if the police found Lester that he would tell what had been done to him . . ."; defendant and his companion in crime then planned to bury the victim; and at some later point they decided to shoot him and place him on a railroad track where his body would be mangled by a passing train.

9. **Criminal Law § 135.4 — first degree murder — sentencing hearing — two aggravating circumstances submitted on same evidence — error**

The trial court in a first degree murder prosecution erred in instructing the jury during the sentencing phase on aggravating circumstances pursuant to G.S. 15A-2000(e)(4) — that the felony was committed for the purpose of avoiding or preventing a lawful arrest — and pursuant to G.S. 15A-2000(e)(7) — that the felony was committed to disrupt or hinder the lawful exercise of any governmental function or the enforcement of laws, since the court submitted the two issues on the same evidence; and such error was prejudicial to defendant in light of the highly questionable quality and credibility of the State's primary evidence.

10. **Criminal Law §§ 86.1, 135.4 — illegally seized bullets — admissibility for impeachment purposes**

The trial court erred in allowing the State to introduce illegally seized .380 caliber bullets at the sentencing hearing for the purpose of impeaching defendant since there was no proper foundation laid for introduction of the evidence.

11. **Criminal Law § 135.4 — first degree murder — sentencing hearing — intoxication as mitigating factor**

When a criminal defendant contends that his faculties were impaired by intoxication, such intoxication must be to a degree that it affects defendant's ability to understand and control his actions before the court is required to instruct on such intoxication as a mitigating factor pursuant to G.S. 15A-2000(f)(6).

12. **Criminal Law § 135.4 — first degree murder — sentencing hearing — mitigating factors — duty of court to point out**

G.S. 15A-2000(f)(9) providing that the jury may consider as a mitigating factor "any other circumstance arising from the evidence which the jury deems to have mitigating value" does not require the court to point to every factor arising from the evidence which might conceivably be considered by the jury under that provision.

13. **Criminal Law § 135 — death sentence — discretion of jury**

There was no merit to defendant's contention that the trial court erred in failing to instruct the jury that they might recommend a sentence of life im-

prisonment even though they found the aggravating circumstances outweighed those in mitigation, since such an instruction would permit the jury to disregard the procedure outlined by the legislature and impose the sanction of death at their own whim.

**14. Criminal Law § 138— severity of sentence—consideration on appeal**

Though G.S. 15A-2000(d)(2) gives the Supreme Court the authority to review a sentence to determine if it is disproportionate to the sentences imposed in similar cases, such review function should be employed only in cases where both phases of the trial of a defendant have been found to be without error.

Justice BROCK did not participate in the consideration or decision of this case.

Justice HUSKINS concurring and joins in the concurring opinion of Justice CARLTON.

Justice CARLTON concurring.

APPEAL by defendant from *Braswell, J.,* 9 October 1978 Regular Criminal Session, CUMBERLAND Superior Court.

Upon pleas of not guilty defendant was tried on bills of indictment charging him with (1) murder, (2) armed robbery and (3) kidnapping. The alleged victim of all three offenses was Lester Collins.

Principal evidence against defendant was provided by Annie Lois Goins Shamback (Lois) who testified under a grant of immunity pursuant to G.S. 15A-1052. In return for her "truthful testimony" against Charles D. Goins and defendant, the state agreed to dismiss charges against her relating to the murder, robbery and kidnapping of Lester Collins. (Charles D. Goins was tried prior to the date of defendant's trial.) Her testimony is summarized in pertinent part as follows:

At the time of defendant's trial (October 1978) she was 23 years of age and had been married approximately six months. She had two children that were born prior to her marriage. Charles Goins (Charles) was her brother and Collins was married to her sister. On 2 July 1977 her sister was a patient at Dorothea Dix Hospital.

On 2 July 1977 she and her young son lived with defendant at Lumberton, N.C. She and defendant were not married to each other but had lived together for approximately 18 months prior to

said date. Charles had been staying with them for about a week, his home being near Fayetteville.

Late in the afternoon of said date she, defendant and Charles went to Fayetteville in her white 1968 Ford Fairlane. Their destination was Charles' home but they stopped at a bar in East Fayetteville, went in, and defendant and Charles "had a few beers". When they returned to the car they discovered that a C.B. and scanner belonging to defendant had been taken from the car while they were in the bar. Defendant had reason to believe that Magaline Tyler's brother was one of the persons who stole the C.B. and scanner and insisted on going to her house which was not far from the bar.

When defendant, Lois and Charles left the bar, defendant was driving. After driving a short distance in the neighborhood, defendant and Charles got out of the car and told Lois to circle the area while they looked for the person or persons who stole the equipment from the car. After circling for some 30 minutes, Lois drove the car to Magaline Tyler's home. Defendant came out of the house and Collins was following him, asking defendant to take him home. At first, defendant refused, but Collins kept on asking and eventually defendant said he would take him home. Collins had been drinking.

Defendant got under the wheel, Collins got in the backseat and Lois and Charles rode on the front seat. Defendant was quite angry about his C.B. and scanner being stolen and was also angry with Lois for circling so long.

Defendant then drove the car down Cedar Creek Road east of Fayetteville to Lois' mother's home which was also Charles' home. When they arrived there, Charles went into the house to get some clothes. Collins remained in the backseat of the car and wanted defendant to carry him back to Fayetteville.

The four of them left the Goins home and were situated in the car in the same positions as when they arrived there. They proceeded to drive down Cedar Creek Road and while riding Charles leaned over and whispered something to defendant. Defendant then turned the automobile down a dirt road, went to the end of it and turned around in the direction of Cedar Creek Road. It was then "way after dark".

Defendant stopped the car on the dirt road and got out. He told Collins to get out. Defendant had a gun and as Collins got out of the car, defendant hit Collins on the side of his head with the gun. Collins told defendant he hadn't done anything, but defendant hit him again with the gun, bringing blood from Collins' face. Charles and Lois remained in the car while defendant and Collins went behind the car.

When the two men reached the rear of the car, Lois saw Collins advancing on defendant and then heard three shots fired. Before the shots were fired, Lois could not see what Collins was doing to defendant, "just his body going toward" defendant.

After the shots were fired, Charles got out of the car and went to the back of it. Lois could hear "moaning" and saw that Collins was on the ground. She got out of the car and saw Charles and defendant standing beside Collins who was on the ground a short distance from the trunk of the car. She could tell that Collins' clothing was wet. Defendant and Charles then took Collins and put him in the trunk of the car. They then discussed what to do with Collins.

Defendant said that he knew a place where they could bury Collins and it would take a long time for the police to find him. Collins was alive at that time. Defendant then told Lois to drive the car because he was cut on his left side.

At defendant's instruction, Lois drove the car to Lumberton to defendant's home. Collins was still in the trunk and was "begging for his life". All of the occupants of the car except Collins got out and went into defendant's home. There was a pool of blood on the driver's side of the car. Lois got a washrag and washed the blood off the car. While she was doing that, defendant was looking for a shovel with which to carry out defendant's and Charles' plan to bury Collins.

When Collins begged defendant to let him out of the trunk, defendant and Charles both told him that he might as well shut up because he was going to die anyway. At defendant's request Lois cleaned up his wound and placed a bandage on it. His shirt had blood on it and he took it off after which Lois washed blood off the back of his pants.

While at defendant's home Charles wiped blood off of a knife that he had. After staying at the home for about thirty minutes, they all left with Lois driving and Collins remaining in the trunk. After Lois drove some distance into Robeson County, defendant decided that he would drive. He stated that he had changed his mind about burying Collins and knew where he wanted to carry him.

With defendant driving they proceeded to the village of Buie in Robeson County. At that point defendant drove on to a service road adjacent to the Seaboard Coastline Railroad and proceeded north. After travelling on that road for a reasonable distance, defendant turned the car around and stopped. Defendant got out and opened the trunk of the car after which Charles and Lois got out. Defendant cursed Collins and told him to get out. Defendant and Charles then took Collins out of the trunk and laid him on some rocks. Defendant had a gun which he then pointed down at Collins' head and fired two shots. Lois had reentered the car at the time the shots were fired but immediately got out and Charles had the gun at that time. Charles also had Collins' billfold.

Defendant and Charles then took Collins by his arms and dragged him onto the railroad track. Defendant stated that a train would come along and "do away with him where the police would have a hard time recognizing who he was".

Thereafter, defendant, Lois and Charles got back into the car with defendant driving. Charles had the gun and said that "it was a good shooting little gun". Defendant stated that he shot Collins between his eyes and that Charles shot him in the back of his head.

Defendant, Lois and Charles then proceeded to ride around in Robeson County, and as soon as it was light they went to the home of some of defendant's relatives where they cleaned blood from the trunk of the car. Thereafter they went to bed at a relative's home and later in the day returned to Fayetteville.

On cross-examination Lois testified that defendant worked until noon on 2 July 1977. When he came home after work she noticed that he had been drinking. Defendant and another man brought a six-pack of beer to the home. Defendant, Charles, and

the other man drank the beer. Defendant drank more beer at the bar in East Fayetteville and consumed some more a little later.

Other evidence presented by the state tended to show:

On 2 July 1977 Collins lived and worked on the farm of Henry Clark approximately 1.5 miles from Fayetteville on Cedar Creek Road. At around 1:00 p.m. on that day, Mr. Clark paid Collins $95 or $97 for work which he had done.

At around 11:30 that night two women saw a pool of blood on a dirt road some 300 feet from Cedar Creek Road. The next morning police were notified about the blood. Upon arrival at the scene, in addition to the blood, they found three spent casings, two spent bullets, a knife and a box of matches in or near the blood. The knife was identified as one belonging to, or similar to one belonging to, Collins. The home of Leon Goins, father of Lois and Charles, was located in the general area where the blood was found.

At around 3:00 a.m. on 3 July 1977 Miller Maynor was driving his car on the service road adjacent to the railroad north of Buie. He passed a light colored economy car occupied by three persons and shortly thereafter he observed a human body on the railroad track. Knowing that an Amtrak train was due to pass at about that hour, he went to the body. Upon determining that the person was dead, he dragged the body off the track. He then went to the police station in Pembroke, reported what he had found and then returned to the scene where he was met by Deputy Sheriff Garth Locklear.

A rescue unit removed the body to Southeastern General Hospital in Lumberton where Dr. Bob Andrews, a pathologist, performed an autopsy later that morning. Dr. Andrews discovered extensive cuts to Collins' forehead, face, neck, back, chest, thigh, arms and hands. He also found gunshot wounds in Collins' neck, groin, leg and thigh. He removed a bullet from the victim's neck and another one from his brain. In Dr. Andrews' opinion, death was caused by the shot to the victim's head but either shot could have caused death. It was his further opinion that if the victim had not been shot, he could have died from the cuts. A test of the victim's blood revealed 140 milligrams of alcohol per hundred milliliters of blood, the equivalent of .14 on a breathalyzer machine.

State v. Goodman

Defendant's evidence consisted of the testimony of Charles Goins. Charles' testimony is substantially consistent with the version of events testified to by Lois with one major exception. He stated that he was the person who shot and cut Collins; that he did so because Collins mistreated his sister; and that defendant had nothing to do with the murder, "wasn't with" him and Lois when the killing occurred and "hadn't done nothing".

On cross-examination Charles testified that he had been convicted for breaking and entering, larceny, assault with a deadly weapon, driving under the influence, escaping from prison, driving while license permanently revoked and assault inflicting serious injury. He further testified that "I carry a knife and keep it pretty sharp. If somebody messes with me, I will cut them. It don't take much for me to cut somebody."

The jury returned a verdict finding defendant guilty of first-degree murder by premeditation and deliberation and by the felony murder rule. They also found him guilty of armed robbery and kidnapping.

The court then recessed the trial until the following Monday when proceedings were resumed before the same jury pursuant to G.S. 15A-2000 et seq. to determine if defendant's sentence on the murder conviction would be death or life imprisonment. The state presented evidence summarized as follows:

Gertrude Tyler testified that she was at the Tyler home on the evening of 2 July 1977; that while there she saw Collins, Charles, Lois and defendant; that Collins had been drinking wine and he asked defendant to "run him home"; that defendant appeared not to hear Collins and later he asked him again; that defendant then told Collins "Yeah, I'll run you home. I'll run you to hell, too, while I'm at it"; and that Collins then got into the car with defendant and they rode away. Counsel for defendant stipulated that on 31 January 1967 defendant was convicted in the Superior Court for Robeson County of three counts of armed robbery resulting from a single occurrence on 4 January 1966.

Defendant testified as a witness for himself at the sentencing phase of the trial. His version of the events occurring on 2 July 1977 combines elements of the testimony of Lois and Charles. The gist of defendant's testimony is that he was in the car with them

State v. Goodman

when the shooting and cutting of Collins took place, but that he did not participate in the killing and attempted unsuccessfully to prevent Charles from hurting Collins.

Defendant also introduced into evidence a court docket showing that prior to defendant's trial Charles Goins was allowed to plead guilty, and did plead guilty, to the offense of accessory after the fact of murder "in these cases" and received a prison sentence of six years.

By way of rebuttal, the state presented a police officer who testified that on 5 July 1977 he searched the automobile in question and in the glove compartment found a box of Remington-Peters .380 ammunition — 29 unfired bullets.

Issues as to punishment were submitted to and answered by the jury as follows:

1. Do you find beyond a reasonable doubt the presence of one or more of the following aggravated circumstances?

   a. The defendant had been previously convicted of a felony involving the use or threat of violence to the person, to-wit: three counts of the felony of armed robbery in Robeson County Superior Court on January 31, 1967, for offenses committed on January 4, 1966.

   ANSWER: YES

   b. The capital felony of murder in the first degree was committed for the purpose of avoiding or preventing a lawful arrest.

   ANSWER: YES

   c. The capital felony was committed while the Defendant was engaged in the commission of or attempt to commit a robbery or kidnapping, either or both.

   ANSWER: YES

   d. The capital felony was committed to disrupt or hinder the lawful exercise of the enforcement of the criminal law, to-wit: the arrest of the Defendant for the offense of robbery or kidnapping, either or both.

   ANSWER: YES

  e. The capital felony was especially heinous, atrocious, or cruel.

  ANSWER: YES

2. Do you find that one or more of the following mitigating circumstances existed at the time the murder was committed?

  a. The defendant was an accomplice in or accessory to the capital felony committed by another person and his participation was relatively minor.

  ANSWER: NO

  b. The capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was impaired.

  ANSWER: NO

  c. Do you find any other circumstance arising from the evidence which the jury deems to have mitigating value.

  ANSWER: YES

3. Do you find beyond a reasonable doubt that the mitigating circumstances are insufficient to outweigh the aggravating circumstance?

  ANSWER: YES

4. Do you find beyond a reasonable doubt that the aggravating circumstance is sufficiently substantial to call for the imposition of the death penalty?

  ANSWER: YES

The jury recommended that a sentence of death be imposed on the defendant. Pursuant thereto the court imposed the death sentence.

As to the armed robbery and kidnapping charges, the court imposed a life sentence in each case, the sentence in the kidnapping case to begin at expiration of sentence in the armed robbery case.

*Attorney General Rufus L. Edmisten, by Assistant Attorney General Thomas B. Wood, for the State.*

*Harold D. Downing for defendant-appellant.*

BRITT, Justice.

Pursuant to G.S. 15A-2000 *et seq.*, this case was tried in two phases: (1) to determine the guilt or innocence of defendant and (2) to determine his sentence for first-degree murder following his conviction of that charge. We will discuss the errors assigned under each phase.

## PHASE I — GUILT DETERMINATION

[1] By his first assignment of error defendant contends that, in connection with the charge of first-degree murder, the court erred in failing to instruct the jury concerning the effect of voluntary intoxication upon the elements of intent, premeditation and deliberation. We find no merit in this assignment.

"It is well settled that voluntary drunkenness is not a legal excuse for crime; but where a specific intent, or premeditation and deliberation, is essential to constitute a crime or a degree of a crime, the fact of intoxication may negative its existence. Thus, while voluntary drunkenness is not, per se, an excuse for a criminal act, it may be sufficient in degree to prevent and, therefore, disprove the existence of a specific intent, such as the intent to kill." 4 Strong's N.C. Index 3d, Criminal Law § 6, p. 43, and cases cited therein. To reduce first-degree murder to second-degree murder the defendant's intoxication must be so great that he is "utterly unable" to form a deliberate and premeditated purpose to kill. *State v. Propst,* 274 N.C. 62, 72, 161 S.E. 2d 560, 567 (1968); *see also, State v. McLaughlin,* 286 N.C. 597, 213 S.E. 2d 238 (1975), *death sentence vacated,* 428 U.S. 903, 96 S.Ct. 3206, 49 L.Ed. 2d 1208 (1976); *State v. Bunn,* 283 N.C. 444, 196 S.E. 2d 777 (1973); *State v. Wilson,* 280 N.C. 674, 187 S.E. 2d 22 (1972).

Whether intoxication and premeditation can coexist depends upon the degree of inebriety and its effect upon the mind and passions; no inference of the absence of deliberation and premeditation arises as a matter of law from intoxication. *State v. Hamby,* 276 N.C. 674, 174 S.E. 2d 385 (1970), *vacated on other grounds,* 408

State v. Goodman

U.S. 937, 92 S.Ct. 2862, 33 L.Ed. 2d 754 (1972). Ordinarily, then, the degree of intoxication and its effect upon the elements of premeditation and deliberation is an issue for the jury unless the evidence is insufficient to warrant submission of the issue to them. *Id.* the evidence offered at the first phase of the trial in this case was, however, insufficient to raise the issue of intoxication to a degree precluding premeditation and deliberation, and the trial court did not err in refusing to charge thereon. *State v. McLaughlin, supra; State v. Fowler,* 285 N.C. 90, 203 S.E. 2d 803 (1974), .vacated on other grounds, 428 U.S. 904, 96 S.Ct. 3212, 49 L.Ed. 2d 1212 (1976); *State v. Cureton,* 218 N.C. 491, 11 S.E. 2d 469 (1940).

In *McLaughlin* there was ample evidence that the defendant had been drinking, but four witnesses who testified that defendant had been drinking prior to and at the time of the incident in question also testified that defendant was not drunk. In upholding the trial court's refusal to instruct on intoxication as a defense, the court said that there was no "evidence that defendant's mind was so intoxicated and his reason so overthrown that defendant could not form a specific intent to kill." 286 N.C. 597 at 609.

In *Fowler* the court again upheld the trial court's refusal to instruct on the defense of intoxication, noting that there was evidence of defendant's drinking but that the only evidence of drunkenness was his own exculpatory statement.

In *Cureton* there was evidence that defendant was drinking at the time of the incident, but the record was "devoid of any suggestion that defendant's mental processes were deranged." 218 N.C. 491 at 496. Holding that absent such testimony there was no duty to instruct on the defense of intoxication, the court said, "there must be some evidence tending to show that the defendant's mental processes were so overcome by the excessive use of liquor or other intoxicants that he had temporarily, at least, lost the capacity to think and plan." *Id.* at 495.

We believe that the decision on this point in this case is controlled by the cases which we have cited and discussed. Admittedly, there is evidence in this record which tends to establish that defendant had been drinking. Lois testified that defendant had been drinking when he came home from work, but that she did not know how much, that he shared a six-pack of beer with two

other men on the afternoon of the murder, and that he had "some beer" at a bar at which they stopped for less than thirty minutes before decedent got into the car with them. She also testified that there was beer in the car when she, her brother, defendant and the victim were riding together, but that she did "not remember if Buck [defendant] was drinking while he was driving." Her testimony fails to show that defendant's mental capacities were affected in any way by the beer which he consumed. To the contrary, her testimony shows that defendant was capable of driving, gave her directions when she drove, led the group on a search through a neighborhood looking for a CB and scanner stolen from his car, and participated in planning a scheme for disposing of the victim's body. Her testimony tends to show that defendant, despite the fact that he had been drinking, was capable of premeditation and deliberation and could form the specific intent to kill which is an essential element of first-degree murder.

The other state's witness who made reference to defendant's drinking clearly stated that defendant was "not in a drunken condition." Defendant himself presented no evidence at the first phase of the trial which tended to show that he was intoxicated. The only witness presented in his behalf testified that he did not see defendant on the day which the murder occurred. On this evidence we hold that the court was not required to charge the jury upon the defense of intoxication. There was no evidence which showed that defendant's capacity to think and plan was affected by drunkenness.

By his second assignment of error defendant contends the court improperly required the jury to specify in its verdict the legal theory upon which they found defendant guilty of first-degree murder. He argues that the trial judge, by the manner in which he explained this procedure to the jury, inadvertently expressed an opinion as to defendant's guilt. Further, he argues that instructing on both the theory of premeditation and deliberation and the theory of felony-murder was confusing to the jury.

[2] Before examining the specific charge given the jury, we think it appropriate to restate two principles which clarify the rationale underlying the trial court's decision to require that the jury specify in its verdict the theory upon which they found defendant guilty of first-degree murder. (1) Where the conviction

of a defendant for first-degree murder is based upon the felony-murder rule and there is no proof of malice, premeditation and deliberation, proof that the murder was committed in the perpetration of the felony is an "essential and indispensable element in the state's proof," and a verdict of guilty on the underlying felony *cannot* provide a basis for additional punishment. *State v. Thompson*, 280 N.C. 202, 185 S.E. 2d 666 (1972). (2) Where the conviction of a defendant for first-degree murder is based upon proof of malice, premeditation and deliberation, proof of an underlying felony — although that felony be part of the same continuous transaction — is *not* an essential element of the state's homicide case, and the defendant *may* therefore be sentenced upon both the murder conviction and the felony conviction. *State v. Tatum*, 291 N.C. 73, 229 S.E. 2d 562 (1976).

In the case at hand defendant was indicted for murder, armed robbery, and kidnapping. The murder indictment was drawn in the manner prescribed by G.S. 15-144 and would support a guilty verdict based upon the theory of premeditation and deliberation or upon the application of the felony-murder rule. *State v. Bush*, 289 N.C. 159, 221 S.E. 2d 333, *death sentence vacated*, 429 U.S. 809, 97 S.Ct. 46, 50 L.Ed. 2d 69 (1976); *State v. Moore*, 284 N.C. 485, 202 S.E. 2d 169 (1974); *State v. Thompson, supra.* The evidence at trial was sufficient to justify submission of the charge of first-degree murder under either theory. There was also sufficient evidence to submit to the jury the issue of defendant's guilt or innocence of the armed robbery and kidnapping charges. If defendant were found guilty of first-degree murder solely by virtue of the felony-murder rule, the court would be precluded from imposing upon him additional punishment for the underlying felony; if defendant were found guilty of first-degree murder pursuant to premeditation and deliberation, and if the jury also found him guilty on one or more other felony charges, the court would not be so precluded. Thus, it was appropriate that the court determine the basis of the jury's verdict so that defendant might be properly sentenced.

In addition, G.S. 15A-1237 authorizes the use of a written verdict. The jury's verdict "must be in writing, signed by the foreman, and made a part of the record of the case." G.S. 15A-1237(a). This section is intended to aid the trial court in avoiding the taking of verdicts which are flawed by the inadver-

tent omission of some essential element of the verdict itself. "It is contemplated that the jury will be given a verdict form setting out the permissible verdicts recited by the judge in his instructions." Official Commentary, G.S. 15A-1237. As the court in this case explained to the jury, there were two permissible guilty verdicts to the charge of first-degree murder, guilty by reason of the felony-murder rule or guilty by reason of premeditation and deliberation. If the jury's verdict were general, not specifying the theory upon which guilt was found, the court would have no way of knowing what theory the jury used and would not have proper basis for passing judgment. If, as the court required in this case, the jury's verdict specified the theory, the court could sentence appropriately. We believe the required use of a specific written verdict in this case is consistent with the intent of G.S. 15A-1237 and that it enabled the trial court to avoid the difficulty which that provision seeks to alleviate.

Having decided that the procedure used by the trial court was appropriate and that there was good reason for its use, the remaining question is whether the court, in using this procedure, confused the jury or inadvertently expressed an opinion as to defendant's guilt. We have carefully scrutinized this aspect of the court's instructions to the jury, and we perceive no prejudicial error.

Defendant has assigned error to the following excerpt from the charge:

Members of the jury, I instruct you that if you should find the defendant guilty of murder in the first degree, we also require you in this case, because there are two theories and two applications of the law, to write down that of which you have found the defendant guilty. If it should be that you have found him guilty beyond a reasonable doubt of both murder in the first degree by premeditation and deliberation and guilty of murder in the first degree by the felony murder rule, we would request that you so write in both of those as your verdict. Remembering all of the while there can only be one charge and one ultimate conviction, if any, of murder in the first degree. There are not two separate verdicts of murder in the first degree, but your return of a verdict in this elaborated form, if he be guilty at all, would then as a

matter of law let all know your particulars of your specific verdict. By having so instructed you, I do not mean to infer in any manner, whatsoever, what your verdict should be to this charge or to any of the other charges in the case. Below the space for your verdict is a space for the date and a line for the foreman of the jury to sign. Since the first of July of this year, it is the requirement of our law that jury verdicts shall be in writing and shall be signed by the foreman of the jury. The other members of the jury are not required to sign.

Apparently, his argument is that by linking the two theories with the word "and" rather than "or," the court implied that defendant was guilty of first-degree murder. This argument finds no support when this portion of the charge is examined in context with the remainder.

When the judge began his instruction on the murder charge, he said:

Under the law and the evidence in this case on this charge, it is your duty to return one of the following three verdicts: that is to say, guilty of murder in the first degree or guilty of murder in the second degree or not guilty. Now, as you come to consider whether or not he is guilty or not guilty of murder in the first degree, there are two separate theories upon which the State has proceeded and under which evidence has been offered; and those theories are whether or not the defendant be guilty of murder in the first degree by premeditation and deliberation or whether or not he be guilty of murder in the first degree by the felony murder rule or any lesser included offense or not guilty. I will discuss this aspect of it with you further as I come at the close of the trial to discuss with you your actual return of a written verdict and the form which will be handed to you.

The judge then charged on each of the two theories, making it clear that, "[i]n the alternative," the jury might find defendant guilty upon either of them alone or both of them together. We do not believe this instruction confused the jury, nor do we find any expression of opinion by the court in the charge. Twice during this portion of the instructions the judge told the jury that they were not to infer from the instruction, "in any manner, what-

soever," what their verdict should be. This assignment of error is overruled.

[3]  By his third assignment of error defendant contends the court improperly accepted an incomplete jury verdict at the conclusion of the first phase of the trial. He argues that the trial court asked questions of the jury which suggested a desired verdict to them. His contention is that the court should have reinstructed the jury upon the issues submitted to them and required them to return to the jury room for further deliberations. We do not agree.

When the jury concluded its deliberations and reconvened in open court to render the verdict, the following exchange occurred:

CLERK: Members of the jury, look upon the defendant. You say Buck Junior Goodman is guilty of murder in the first degree by premeditation and deliberation, or guilty of murder in the first degree by the felony murder rule. Is that your verdict?

FOREMAN: Yes.

CLERK: So say you all?

THE JURY ANSWERS AFFIRMATIVE.

COURT: For clarity, members of the jury, are you saying that you are returning as your verdict that he is guilty of murder by both of those propositions of law?

FOREMAN: Murder in the first degree.

COURT: By premeditation and deliberation, and guilty of murder in the first degree by the felony murder rule under both principles of law? Is that the verdict of the jury?

FOREMAN: It was murder in the first degree by premeditation, and it was our understanding that you also wanted us to put that other in there also.

COURT: If that was what you found beyond a reasonable doubt.

FOREMAN: If we reached premeditation, which we did.

COURT: For clarity, am I to understand that the verdict of the jury in this charge is that the defendant is guilty of murder in the first degree by premeditation and deliberation?

FOREMAN: Yes sir.

COURT: For clarity, am I to understand that the verdict of the jury is guilty of murder in the first degree by the felony murder rule in addition to your finding of guilty of murder in the first degree by premeditation and deliberation?

FOREMAN: Yes.

COURT: Is that the verdict of the jury on this charge so say you all?

JURY: Yes.

The record also discloses the following:

THE CLERK POLLS THE JURY IF THE VERDICT OF GUILTY OF MURDER IN THE FIRST DEGREE BY PREMEDITATION AND DELIBERATION AND GUILTY OF MURDER IN THE FIRST DEGREE BY THE FELONY MURDER RULE IS THEIR OWN INDIVIDUAL VERDICT AND IF EACH JUROR STILL ASSENTS THERETO. ALL JURORS ANSWER IN THE AFFIRMATIVE.

We hold that this exchange was not improper and that the court was not required to return the jury to the jury room for additional deliberation. The court may make inquiry of the jury to ascertain the meaning of its verdict, thereby eliminating any ambiguity or uncertainty. *Davis v. State*, 273 N.C. 533, 160 S.E. 2d 697 (1968). In doing so the judge must not suggest to the jury what he believes to be the proper verdict. *State v. Godwin*, 260 N.C. 580, 133 S.E. 2d 166 (1963); *State v. Gatlin*, 241 N.C. 175, 84 S.E. 2d 880 (1954).

In this case the court was attempting to dispel the ambiguity which was created by the jury foreman's response to the clerk's first question. The judge made certain that the jury understood that his questions were asked "for clarity" and that they were not to respond affirmatively to any question he asked unless the issue about which he questioned them was one which they had themselves already resolved beyond a reasonable doubt. There was no need to return them to the jury room for further deliberation as they had already indicated that they found defendant guilty of

first-degree murder. The thrust of the court's questions was directed at determining the basis for the verdict, a necessary determination upon which we have already commented. This assignment of error is overruled.

[4] By his ninth assignment of error defendant contends that he was improperly sentenced for the offenses of kidnapping and armed robbery as those offenses merged with the murder conviction. As we have already said, no merger of the felony occurs when the homicide conviction is based upon the theory of premeditation and deliberation. *State v. Thompson, supra.* Defendant was found guilty by virtue of premeditation and deliberation as well as by application of the felony-murder rule. Thus, the court could disregard the felony-murder basis of the homicide verdict and impose additional punishment upon defendant for the crimes of armed robbery and kidnapping. *State v. Tatum, supra.* This assignment of error is overruled.

For the reasons stated, we find no error in the guilt determination phase of defendant's trial and the judgments entered on the kidnapping and armed robbery charges.

PHASE II — SENTENCE DETERMINATION

By his fourth assignment of error defendant contends that Article 100 of G.S. Chapter 15A (G.S. 15A-2000 et seq.) is unconstitutional. In accord with a well-established precept of appellate review, this court refrains from deciding constitutional questions when there is an alternative basis upon which a case may properly be decided. *State v. Jones,* 296 N.C. 495, 251 S.E. 2d 425 (1979); *State v. Crabtree,* 286 N.C. 541, 212 S.E. 2d 103 (1975); *State v. Jones,* 242 N.C. 563, 89 S.E. 2d 129 (1955). Because of our decision in the sentence determination phase of this case, it is not necessary that we rule upon the constitutionality of G.S. 15A-2000 et seq. at this time. We conclude that there was error in the instructions given to the jury at the sentencing phase of the trial.

The general scheme of our death penalty statute enacted by the 1977 General Assembly is: Upon conviction or adjudication of guilt of a defendant of a capital felony, the court conducts a separate sentencing proceeding to determine whether the defendant should be sentenced to death or life imprisonment. G.S. 15A-2000(a)(1). Instructions determined by the trial judge to be warranted by the evidence are given in his charge to the jury

prior to its deliberation in determining the sentence. The judge should instruct that the jury must consider any aggravating circumstance or circumstances or mitigating circumstance or circumstances enumerated in G.S. 15A-2000(e) and (f) which are supported by the evidence, and he should furnish to the jury a written list of issues relating to such aggravating or mitigating circumstance or circumstances. After hearing the evidence, arguments of counsel and instructions of the court, the jury must deliberate and render a sentence recommendation based upon (1) whether any sufficient aggravating circumstance or circumstances as enumerated in the statute exist, (2) whether any sufficient mitigating circumstance or circumstances as enumerated in the statute which outweigh the aggravating circumstance or circumstances found, exist, and (3) based on these considerations, whether the defendant should be sentenced to death or to life imprisonment. G.S. 15A-2000(b).

G.S. 15A-2000(d) provides:

(d) Review of Judgment and Sentence.—

> (1) The judgment of conviction and sentence of death shall be subject to automatic review by the Supreme Court of North Carolina pursuant to procedures established by the Rules of Appellate Procedure. In its review, the Supreme Court shall consider the punishment imposed as well as any errors assigned on appeal.

> (2) The sentence of death shall be overturned and a sentence of life imprisonment imposed in lieu thereof by the Supreme Court upon a finding that the record does not support the jury's findings of any aggravating circumstance or circumstances upon which the sentencing court based its sentence of death, or upon a finding that the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor, or upon a finding that the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant. The Supreme Court may suspend consideration of death penalty cases

until such time as the court determines it is
prepared to make the comparisons required under
the provisions of this section.

(3) If the sentence of death and the judgment of the
trial court are reversed on appeal for error in the
post-verdict sentencing proceeding, the Supreme
Court shall order that a new sentencing hearing
be conducted in conformity with the procedures of
this Article.

Read together, G.S. 15A-2000(d)(1) and (d)(3) empower this
court to review errors assigned in the trial and sentencing
phases. When prejudicial error is found, the court must order a
new sentencing hearing.

In the case at hand, after evidence and arguments were
presented at the sentencing phase, the court submitted issues
upon the aggravating circumstances enumerated in G.S. 15A-2000
(e)(3), (e)(4), (e)(5), (e)(7), and (e)(9). We think the court erred in sub-
mitting issues under both subsections (e)(4) and (e)(7) and that
because thereof defendant should receive a new sentencing hear-
ing. We will examine the various provisions on which issues of ag-
gravating circumstances were submitted.

1.

[5]    G.S. 15A-2000(e)(3) states that one of the aggravating factors
which may justify the imposition of the death penalty is the fact
that the "defendant had been previously convicted of a felony in-
volving the use or threat of violence to the person." This section
requires that there be evidence that (1) defendant had been con-
victed of a felony, that (2) the felony for which he was convicted
involved the "use or threat of violence to the person," and that (3)
the conduct upon which this conviction was based was conduct
which occurred prior to the events out of which the capital felony
charge arose. If there is no such evidence, it would be improper
for the court to instruct the jury on this subsection.

In *State v. Rust*, 197 Neb. 528, 250 N.W. 2d 867, *cert. denied*,
434 U.S. 912, 98 S.Ct. 313, 54 L.Ed. 2d 198 (1977), defendant con-
tended that the sentencing authority's finding that he had
previously been convicted of a felony "involving the use or threat
of violence to the person" was inconsistent with a finding that

this factor was not present in the case of *State v. Ell*, 196 Neb. 800, 246 N.W. 2d 594 (1976). In *Rust* the state offered as evidence a record of defendant's 1969 felony conviction for assault with intent to do great bodily harm; in *Ell* the state's evidence showed only that defendant had been charged with a similar offense. Overruling Rust's contention, the Nebraska court held that the state must present "proof of actual guilt" to sustain a finding that this aggravating circumstance was present. When the state's evidence showed only that a defendant had been charged with a felony as opposed to a conviction for that crime, it was not inconsistent to find that the aggravating factor set out in this provision had not been shown to exist. "Clearly the language of that subsection excludes the possibility of considering mere arrests or accusations as factors in aggravation." *Provence v. State*, 337 So. 2d 783 (Fla. 1976) *cert. denied*, 431 U.S. 969, 97 S.Ct. 2929, 53 L.Ed. 2d 1065 (1977). It is improper to instruct the jury upon the factor enumerated in subsection (e)(3) when there is no evidence which tends to show a felony conviction. Also, the felony for which the defendant has been convicted must be one involving threat or use of violence to the person. It cannot, under this provision, be a crime against property.

Finally, we believe that the "previously convicted" language used by the legislature in subsection (e)(3) refers to "criminal activity conducted prior to the events out of which the charge of murder arose." *State v. Stewart*, 197 Neb. 497, 250 N.W. 2d 849 (1977); *see also, State v. Rust, supra; State v. Holtan*, 197 Neb. 544, 250 N.W. 2d 876, *cert. denied*, 434 U.S. 912, 98 S.Ct. 313, 54 L.Ed. 2d 198 (1977). To decide otherwise would lead to unnecessary duplication within the statute, for G.S. 15A-2000(e)(5) enumerates those felonies which occur simultaneously with the capital felony which the legislature deems worthy of consideration by the jury. It would be improper, therefore, to instruct the jury that this subsection encompassed conduct which occurred contemporaneously with or after the capital felony with which the defendant is charged.

In the case *sub judice* defendant stipulated at the sentencing phase that he had been convicted on 31 January 1967 of three counts of armed robbery arising from a single incident which occurred on 4 January 1966. Armed robbery, by definition, involves the use or threat of violence to the person of the victim. Defend-

ant was convicted of this crime, and the conduct upon which his conviction was based did not arise out of the incident upon which the capital felony was charged. The trial court properly refrained from instructing the jury that they might consider under this enumeration the convictions of defendant for armed robbery and kidnapping, which convictions were based upon the same events culminating in the murder of Lester Collins. The evidence in this case was clearly sufficient to justify instruction upon this subsection, and the court properly instructed the jury thereon.

2.

[6]  G.S. 15A-2000(e)(5) states that the jury may consider as an aggravating circumstance justifying the death penalty the fact that the capital felony "was committed *while* the defendant was engaged . . . in the commission of . . . any robbery . . . [or] kidnapping . . ." (emphasis added) or other enumerated felony. In *State v. Cherry*, 298 N.C. 86, 257 S.E. 2d 551 (1979), we have limited the application of this subsection in felony murder cases. This section needs only brief additional comment, for it is otherwise reasonably free from ambiguity. This subsection differs from (e)(3), which we previously discussed, in that it guides the jury's deliberation upon criminal conduct of the defendant which takes place "while" or during the same transaction as the one in which the capital felony occurs. The previous section, as we have already said, deals with prior conduct. Under the rule set forth in *Cherry*, instruction on this provision is appropriate only when the defendant is convicted for first-degree murder upon the theory of premeditation and deliberation.

In instant case, defendant was found guilty upon the theory of premeditation and deliberation as well as by virtue of the felony murder rule. There was ample evidence that Lester Collins was murdered during the course of a kidnapping and armed robbery, and the court was therefore correct in submitting to the jury the aggravating circumstance defined in subsection (e)(5).

3.

[7]  G.S. 15A-2000(e)(9) states that the jury may consider as an aggravating circumstance justifying the imposition of the death penalty the fact that the "capital felony was especially heinous, atrocious, or cruel." While we recognize that every murder is, at

least arguably, heinous, atrocious, and cruel, we do not believe that this subsection is intended to apply to every homicide. By using the word "especially" the legislature indicated that there must be evidence that the brutality involved in the murder in question must exceed that normally present in any killing before the jury would be instructed upon this subsection. *State v. Stewart, supra; State v. Rust, supra; State v. Simants,* 197 Neb. 549, 250 N.W. 2d 881, *cert. denied,* 434 U.S. 878, 98 S.Ct. 231, 54 L.Ed. 2d 158 (1977).

The Florida provision concerning this aggravating factor is identical to ours. Florida's Supreme Court has said that this provision is directed at "the conscienceless or pitiless crime which is unnecessarily torturous to the victim." *State v. Dixon,* 283 So. 2d 1 (Fla. 1973), *cert. denied,* 416 U.S. 943, 94 S.Ct. 1950, 40 L.Ed. 2d 295 (1974); *see also, State v. Alford,* 307 So. 2d 433 (Fla. 1975), *cert. denied,* 428 U.S. 912, 96 S.Ct. 3227, 49 L.Ed. 2d 1221 (1976). Nebraska has also adopted the Florida construction of this subsection. Both Florida and Nebraska have limited the application of this subsection to acts done to the victim during the commission of the capital felony itself. *State v. Rust, supra; Riley v. State,* 366 So. 2d 19 (Fla. 1979). We too believe that this is an appropriate construction of the language of this provision. Under this construction, subsection (e)(9) will not become a "catch all" provision which can always be employed in cases where there is no evidence of other aggravating circumstances. *Harris v. State,* 237 Ga. 718, 230 S.E. 2d 1 (1976), *cert. denied,* 431 U.S. 933, 97 S.Ct. 2642, 53 L.Ed. 2d 251 (1977).

In the case before us the court instructed as follows in his discussion of G.S. 15A-2000(e)(9):

You are instructed that the words "especially heinous, atrocious or cruel" means extremely or especially or particularly heinous or atrocious or cruel. You're instructed that "heinous" means extremely wicked or shockingly evil. Atrocious means marked by or given to extreme wickedness, brutality or cruelty, marked by extreme violence or savagely fierce. It means outrageously wicked and vile. "Cruel" means designed to inflict a high degree of pain, utterly indifferent to or enjoyment of the suffering of others.

We hold that this instruction is in accord with the construction of this subsection which we have adopted and that its submission to the jury was proper in light of the evidence in this case. The evidence reveals that decedent was shot several times and then cut repeatedly with a knife. Still living, he was placed in the trunk of a car where he remained for several hours. His struggle to escape from the trunk could be heard. Decedent, still in the trunk, was then driven into another county where he was taken from the car. He was placed upon the ground with his head resting upon a rock and then shot twice through the head. This murder is marked by extremely vicious brutality.

4.

[8]  G.S. 15A-2000(e)(4) states that the jury may consider as an aggravating circumstance justifying the imposition of the death penalty the fact that "the capital felony was committed for the purpose of avoiding or preventing a lawful arrest. . . ." This provision, on its face, is unambiguous, but it must also be construed properly so that instructions on this aggravating circumstance will only be given the jury in appropriate cases. In a broad sense every murder silences the victim, thus having the effect of aiding the criminal in the avoidance or prevention of his arrest. It is not accurate to say, however, that in every case this "purpose" motivates the killing.

This provision in the Florida statute, which is identical to North Carolina's statute in this respect, was examined in *Riley v. State, supra,* a case in which the defendant in the course of an armed robbery at his place of employment shot a witness to the crime who was not a police officer. The Florida court gave this analysis of the provision:

Appellant urges us to limit this factor to cases where a police officer or other apprehending official is killed. He suggests that unless we do so, every murder could be characterized as an attempt to eliminate a witness, causing another automatic cumulation of factors. The state argues more narrowly, from the evidence in this case, that the only possible motive for the killing was to eliminate an identification witness.

The record supports the state's view, as the facts admit of only one interpretation. The victim, who well knew and could identify appellant, was immobilized and rendered helpless. He was then executed *after one of the perpetrators expressed a concern for subsequent identification.* Plainly appellant killed to avoid identification and arrest. Appellant concedes this view of the evidence in his brief.

Since the facts show this to be an execution-type killing to avoid lawful arrest, we necessarily reach the broader issue of whether the language of the applicable provision encompasses the murder of a witness to a crime as well as law enforcement personnel. We hold that it does. We caution, however, that the mere fact of a death is not enough to invoke this factor when the victim is not a law enforcement official. Proof of the requisite intent to avoid arrest and detection must be very strong in these cases. Here, of course, it was. 366 So. 2d 19 at 22. (Notes and citations omitted, emphasis added.)

We believe that the construction given this subsection by the Florida court is substantially correct. We add, by way of caution, that even the killing of a police officer or other law enforcement official will not automatically trigger this provision. If, for example, a deranged person began randomly firing a weapon into a crowd of people and fortuitously killed a law officer, it would not necessarily be true that this factor was present. Absent the existence of other evidence supporting instruction thereon, it would be improper to instruct the jury that they might find that one of the purposes for which the officer was killed under these circumstances was to avoid or prevent the defendant's arrest. Before the trial court can instruct the jury on this aggravating circumstance there must be evidence from which the jury can infer that at least one of the purposes motivating the killing was defendant's desire to avoid subsequent detection and apprehension for his crime. We repeat that "the mere fact of a death is not enough to invoke this factor." *Id.*

In this case there was evidence from which the jury could infer that defendant killed Lester Collins to avoid or prevent his arrest. There was testimony that after Collins was shot and cut, but before he was killed, defendant stated that he "was afraid if the

police found Lester that he would tell what had been done to him.
. . ." Defendant and Charles Goins then planned to bury Collins.
At some later point they decided to shoot him and place him on a
railroad track where his body would be mangled by a passing
train. On this factual basis the court was correct in instructing
the jury upon subsection (e)(4).

5.

[9]  Finally, we direct our attention to G.S. 15A-2000(e)(7). This
subsection provides that the jury may consider as an aggravating
circumstance the fact that the "capital felony was committed to
disrupt or hinder the lawful exercise of any governmental func-
tion or the enforcement of laws." This subsection, like subsection
(e)(4), might be broadly construed so that its application would be
proper in any homicide found to have been committed against a
public official, for the purpose of avoiding or preventing a lawful
arrest, or for the purpose of escaping from custody. *See State v.
Rust, supra* at p. 875.

We can envision the difficulty this court is going to en-
counter in construing and applying subsections (e)(4) and (e)(7). We
can also envision the difficulty the trial courts are having and will
have in deciding which of the subsections would be applicable to
the evidence in a particular case. Suffice it to say for the pur-
poses of the case at hand, the trial court erred in submitting
issues of aggravating circumstances pursuant to *both* subsections.

In submitting the issue under (e)(4), the court reviewed the
evidence tending to show that on the night in question while
defendant, Lois, Charles and Collins were on Rural Paved Road
2007 in Cumberland County, that Collins was shot and received
some cuts to his body; that defendant and Charles then made
statements to the effect that they did not want to be arrested for
anything; and that they therefore proposed to take Collins to
Robeson County so that he could not tell on them. The court then
instructed the jury that if they found those to be the facts beyond
a reasonable doubt, and believed that to be an aggravating cir-
cumstance, then they should answer the issue "yes".

In submitting the issue under (e)(7), the trial court reviewed
substantially the same evidence. The court then instructed the
jury that if they found those to be the facts beyond a reasonable

doubt and believed that to be an aggravating circumstance, then they should answer the issue "yes".

We think the submission of the two issues on the same evidence was improper. This amounted to an unnecessary duplication of the circumstances enumerated in the statute, resulting in an automatic cumulation of aggravating circumstances against the defendant. We now address the question whether the error was prejudicial.

Due to the brief time the statute in question has been in effect, we have no precedent of this court to guide us in answering the question. However, on the question of admitting incompetent evidence, we have held that the test of harmless error is whether there is a *reasonable possibility* that the evidence complained of might have contributed to the conviction. *State v. Thacker*, 291 N.C. 447, 189 S.E. 2d 145 (1972); *State v. Fletcher*, 279 N.C. 85, 181 S.E. 2d 405 (1971).

We believe a similar test should be applied when one of the aggravating circumstances listed in G.S. 15A-2000(e) is erroneously submitted by the court and answered by the jury against the defendant. It follows that in cases coming before us presenting this question we must answer the question based on the evidence in the particular case.

Of course, we have no way of *knowing* if submission of the erroneous issue in the case at hand tipped the scales in favor of the jury finding that the aggravating circumstances were "sufficiently substantial" to justify imposition of the death penalty. We note that the jury answered the issues submitted on five aggravating circumstances against defendant and only one issue on mitigating circumstances in his favor. Ordinarily, this might cause us to conclude that erroneous submission of one of the issues on aggravating circumstances could not have influenced the jury's ultimate decision that defendant should receive the death penalty.

However, due to the highly questionable quality and credibility of the state's primary evidence, we think there is a reasonable possibility that submission of the erroneous issue may have made the difference in the jury's decision. Obviously, the terrible crimes in question were committed by defendant, Charles Goins or Lois Goins or a combination of two or all of them. Through

plea bargaining Lois became the key witness for the state and gave testimony damaging to defendant and favorable to her brother Charles. Her character was impeached and Charles' record was shown to be no better than defendant's. Having already received his six-year sentence for participation in the crimes, Charles testified for defendant and stated that he was the chief culprit. Certainly there was more reason for Charles to kill Collins: there was animosity by the Goins family against Collins because of his alleged mistreatment of his wife who was also Charles' sister.

Considering all of the evidence in the case, and in particular the low quality and credibility of Lois' testimony, we hold that submission of the erroneous issue was prejudicial. Therefore, defendant should have a new trial on the sentencing phase.

Before leaving this assignment of error we think that one additional comment needs to be made. We do not intend to imply that the aggravating circumstances enumerated in G.S. 15A-2000 (e) can never overlap or that more than one of them can never arise from a single incident. We realize that in some cases the same evidence will support inferences from which the jury might find that more than one of the enumerated aggravating circumstances is present. This duality will normally occur where the defendant's motive is being examined rather than where the state relies upon a specific factual element of aggravation. In such cases it will be difficult for the trial court to decide which factors should be presented to the jury for their consideration. We believe that error in cases in which a person's life is at stake, if there be any, should be made in the defendant's favor, and that the jury should not be instructed upon one of the statutory circumstances in a doubtful case.

*     *     *

In view of the fact that, for the reason aforestated, there must be a retrial of the sentencing phase of this case, we will comment but briefly on defendant's remaining assignments of error.

[10] By his fifth assignment defendant contends the court erred in allowing the state to introduce illegally seized .380 caliber bullets at the sentencing hearing for the purpose of impeaching him. Defendant acknowledges that the rules set forth in *Harris v.*

*New York*, 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed. 2d 1 (1971), and *Walder v. United States*, 347 U.S. 62, 74 S.Ct. 354, 98 L.Ed. 503 (1954), permit the admission of illegally seized evidence for impeachment purposes. He contends that the evidence admitted in this case did not impeach his testimony and was therefore improperly admitted.

It is clear from the record that defendant responded to a question from the prosecutor on cross-examination that he "never had any bullets for a .38." It is not clear that the .380 Winchester-Western ammunition subsequently introduced by the state is ammunition which can be used in a .38 pistol. Absent such foundation for the introduction of this testimony, this evidence does not impeach defendant's response to the prior question. The state argues that defendant not only denied having .38 bullets, but that he also denied having *any* bullets whatsoever. Under the state's argument proof that defendant had any type of ammunition would impeach this broad denial. The state's interpretation of defendant's testimony finds only slight support in the record and is in direct conflict with defendant's statement that he "did not say that [he] never had any bullets for any type of weapon."

On the record before us we do not believe there was adequate foundation to support the introduction of the .380 caliber bullets into evidence to impeach defendant's testimony. Because we have already determined, for other reasons, that there must be a retrial of the sentencing phase, it is not necessary that we decide whether this error alone would be so prejudicial as to require a new hearing.

By his sixth assignment of error defendant contends that the court erred in two respects in instructing the jury upon intoxication as a mitigating factor. Defendant's first argument is that the court limited a finding of mitigation under G.S. 15A-2000(f)(6) by requiring the jury to find that defendant was drunk before finding this circumstance present. Defendant's second argument hereunder is that the court failed to instruct the jury that any intoxication, however slight, might be considered as a mitigating circumstance under G.S. 15A-2000(f)(9). We shall address these arguments separately.

[11]　G.S. 15A-2000(f)(6) provides that the jury may consider as a mitigating factor the fact that the "capacity of the defendant to

appreciate the criminality of his conduct or to conform his con-
duct to the requirements of law was impaired." With reference to
this provision the court instructed the jury as follows:

> . . . [Y]ou shall take up 2.b. which reads: "The capacity of the
> defendant to appreciate the criminality of his conduct or to
> conform his conduct to the requirements of the law was im-
> paired." I instruct you that the defendant has offered
> evidence which tends to show that he drank approximately
> eight or more beers from the time he got home from work on
> that Saturday, July 2, 1977, until approximately 3 a.m. on the
> Sunday morning of July 3, when he was out on the road by
> the railroad tracks in Robeson County. The defendant con-
> tends that from his drinking beer, he became drunk or intox-
> icated and that this condition impaired him from having the
> mental or physical capacity to appreciate the criminality of
> his conduct or to conform to the requirements of the law.
>
> The State contends that the defendant knew what he
> was doing and that his capacity was not impaired.
>
> Generally, voluntary intoxication is not a legal excuse
> for crime. However, if you believe that he had been drinking
> and was drunk or intoxicated and that this impaired his men-
> tal and physical capacity to appreciate the criminality of his
> conduct, or to conform his conduct to the requirements of the
> law, then you should answer this question 2.b. "yes". On the
> other hand if you do not so find it would be your duty to
> answer 2.b. "no".

We think the instruction adequately explains subsection (f)(6)
in context with the evidence in this case.

Because there are a great many factors which might impair
the defendant's capacity to appreciate the criminality of his con-
duct or to conform it to the requirements of law, the language of
this subsection is necessarily broad. Adequate instruction under
this provision must be linked to the impairing factor or factors
raised by the evidence. In instant case the only such factor was
defendant's consumption of alcohol. We do not think that the
legislature intended, under this subsection, that the jury might
find intoxication, however slight, to be a mitigating circumstance.
If this were true, every murderer, conceivably, would consume

strong drink before taking his victim's life. Nor is the degree of intoxication so great that it precludes the defendant from being found guilty of crime. When the defendant contends that his faculties were impaired by intoxication, such intoxication must be to a degree that it affects defendant's ability to understand and control his actions before subsection (f)(6) is applicable. We think the instruction now under consideration makes it clear that this state of intoxication is required.

[12]  G.S. 15A-2000(f)(9) provides that the jury may consider as a mitigating factor "[a]ny other circumstance arising from the evidence which the jury deems to have mitigating value." We are mindful that a death penalty statute may not restrict the jury's consideration of *any* factor relevant to the circumstances of the crime or the character of the defendant. *Lockett v. Ohio*, --- U.S. ---, 98 S.Ct. 2954, 57 L.Ed. 2d 973 (1978). Even so, we do not believe the court is required to point to every factor arising from the evidence which might conceivably be considered by the jury under this provision. In the instant case the court instructed as follows:

> Again, regardless of how you shall find as to 2.b., you would go and take up 2.c. which reads: "Do you find any other circumstance arising from the evidence which the jury deems to have mitigating value?" The defendant contends that at least you should find the following circumstances to have mitigating value.
>
> First, he contends that the evidence that Charles Goins received a sentence of six years for the offense of accessory after the fact of murder in the first degree is a mitigating circumstance. On the other hand, the State contends that the evidence shows that Charles Goins pled guilty to the offense of accessory after the fact of murder in the first degree by Buck Junior Goodman, and that this was the offense charged against Charles Goins in the bill of information which was the charging instrument against Charles Goins and upon which he entered his plea of guilty.
>
> Second, the defendant contends that he has a limited education and experience and that he stopped school in the 6th grade without completing the same.

Third, he contends that he was attempting to protect the girl he loved, to wit: Annie Lois Goins, who was the mother of one of his children; and

Fourth, he contends that any other circumstance which you, the jury, find from the evidence is a mitigating value and circumstance ought to be considered by you.

If you simply believe that there are other mitigating circumstances in this case which have mitigating value, then you would answer 2.c. "yes". On the other hand, if you are not so satisfied, it would be your duty to answer 2.c. "no".

This instruction highlights some elements of the evidence which might not have been clearly brought to the attention of the jury. Although the court did not refer to defendant's intoxication, the instruction in no way prevents the jury from considering that circumstance. For this reason we believe the charge is adequate. The court is not required to sift through the evidence and search out every possible circumstance which the jury might find to have mitigating value.

[13]   By his seventh assignment of error defendant contends the trial court erred in failing to instruct the jury that they might recommend a sentence of life imprisonment even though they found the aggravating circumstances outweighed those in mitigation. His argument is that without such instruction the jury will mathematically balance the two types of factors against each other and will impose the death penalty whenever aggravating circumstances outnumber mitigating ones. We do not agree that this is the manner in which a jury will reach its decision on this important question or that the instruction for which defendant contends is required by our statute.

It must be emphasized that the deliberative process of the jury envisioned by G.S. 15A-2000 is not a mere counting process. *State v. Dixon, supra; State v. Stewart, supra.* The jury is charged with the heavy responsibility of subjectively, within the parameters set out by the statute, assessing the appropriateness of imposing the death penalty upon a particular defendant for a particular crime. Nuances of character and circumstance cannot be weighed in a precise mathematical formula.

State v. Goodman

At the same time, we believe that it would be improper to instruct the jury that they may, as defendant suggests, disregard the procedure outlined by the legislature and impose the sanction of death at their own whim. To do so would be to revert to a system pervaded by arbitrariness and caprice. The exercise of such unbridled discretion by the jury under the court's instruction would be contrary to the rules of *Furman* and the cases which have followed it. For these reasons defendant's seventh assignment of error is overruled.

[14] By his final assignment of error defendant contends that this court should review the sentence in this case to determine if it is disproportionate to the sentences imposed in similar cases. We recognize that this authority is given to us by G.S. 15A-2000 (d)(2). However, we believe that this review function should be employed only in cases where both phases of the trial of a defendant have been found to be without error. Only then can we have before us the true decision of the jury to which we feel great deference should be accorded. For this reason we express no opinion upon the propriety of any sentence in this case.

In connection with one of his assignments of error, defendant criticizes the wording of the third issue, namely: Do you find beyond a reasonable doubt that the mitigating circumstances are insufficient to outweigh the aggravating circumstances? Since a new trial on the sentencing phase is being awarded on other grounds, we do not pass upon the validity of defendant's criticism. Suffice it to say, the able trial judge followed the statute in forming this issue.

Nevertheless, at the retrial, we believe the following wording would be more appropriate: Do you find beyond a reasonable doubt that the aggravating circumstances found by you outweigh the mitigating circumstances found by you?

For the reasons stated, the verdict rendered at the sentencing phase of defendant's trial, and the judgment of death predicated thereon, are vacated, and this cause is remanded to the superior court for a new trial on the sentencing phase.

New trial on sentencing phase.

Justice BROCK did not participate in the consideration or decision of this case.

Justice HUSKINS concurring.

I support the majority opinion in *Goodman, Cherry* and *Johnson.* At the same time, I join in the concurring opinion of Justice Carlton which correctly, I think, analyzes the results reached in these three cases.

Justice CARLTON concurring.

The Court today hands down three decisions involving the interpretation of our death penalty statutes, this case, *State v. Cherry,* 298 N.C. 86, 257 S.E. 2d 551 (1979) and *State v. Johnson,* 298 N.C. 47, 257 S.E. 2d 597 (1979). In light of my late participation in the consideration of these cases—a participation requested by the other members of the Court—, the gravity of the issues addressed, and my concern lest these decisions be interpreted too broadly, I think it worthwhile to add this concurrence.

After carefully reading the records and briefs submitted by counsel, and listening to the oral arguments on tape, I conclude once again that in the world of criminal justice, there is no more delicate nor difficult issue than that of capital punishment. Sincere and intelligent people disagree strongly on the question of the death penalty. All three branches of both state and federal government have struggled with it for centuries. The United States Supreme Court has at times equivocated about the issue, creating uncertainty and confusion in the lower courts. Our legislature, in response to its constituency and numerous court decisions, has amended our capital punishment law on several occasions. Prosecutors, defense attorneys, and trial judges wrestle daily with the resulting uncertainty each revision brings. It is unfortunate, albeit inevitable, that the course charted by legislative and judicial action is an uncertain one on an issue which touches the deepest human emotions. The beneficial result of this uncertainty, however, is that in deciding whether the State shall take a human life, we proceed with the greatest possible care.

Of this we can be certain: North Carolina law presently provides for the death penalty in certain aggravated cases of first degree murder. The United States Supreme Court has ruled that

capital punishment statutes similar to ours pass constitutional muster. *See Gregg v. Georgia*, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed. 2d 859 (1976); *Proffitt v. Florida*, 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed. 2d 913 (1976). The three decisions filed today are our first interpretations of the most recently enacted capital punishment statutes in North Carolina. G.S. 15A-2000, *et seq.* My concern is that the collective result of these decisions may be seen as a step by this Court to indirectly abolish capital punishment in North Carolina. I do not consider that to be our purpose. We should not attempt to usurp the legislative process. I write this footnote to the excellent opinions of the majority primarily to highlight the narrow results reached by the three opinions filed today. Also, I think an overview of the three opinions will provide a helpful guide to the lower courts.

## I. *State v. Goodman*

### A.

In *Goodman*, defendant was found guilty of first degree murder by premeditation and deliberation *and* by the felony-murder rule. He was also found guilty of armed robbery and kidnapping. At the sentencing stage, the jury found beyond a reasonable doubt these statutory aggravating circumstances:

(1) Defendant had been previously convicted of a felony involving the use or threat of violence to the person. G.S. 15A-2000(e)(3).

(2) The capital felony was committed for the purpose of avoiding or preventing a lawful arrest. G.S. 15A-2000(e)(4).

(3) The capital felony was committed while the defendant was engaged in the commission of or attempt to commit a robbery or kidnapping. G.S. 15A-2000(e)(5).

(4) The capital felony was committed to disrupt or hinder the lawful exercise of the enforcement of laws (arrest of defendant for the robbery or kidnapping offenses). G.S. 15A-2000(e)(7).

(5) The capital felony was especially heinous, atrocious, or cruel. G.S. 15A-2000(e)(9).

With respect to mitigating factors, the jury did *not* find:

(1) The defendant was an accomplice in or accessory to the capital felony committed by another person and his participation was relatively minor. G.S. 15A-2000(f)(4).

(2) The capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirement of law was impaired. G.S. 15A-2000(f)(6).

The jury did deem:

(3) Other circumstances arising from the evidence had mitigating value. G.S. 15A-2000(f)(9).

The jury then found beyond a reasonable doubt that the mitigating circumstances were insufficient to outweigh the aggravating circumstances and that the latter were sufficiently substantial to call for the imposition of the death penalty.

## B.

As I read it, the majority opinion in *Goodman* presents one narrow holding: A new sentencing hearing must be granted when the trial court improperly submits an aggravating circumstance to the jury in a sentencing hearing conducted pursuant to G.S. 15A-2000, and the jury finds that circumstance present *to the prejudice of the defendant.*

Specifically, the majority holds that, under the facts of this case, the aggravating circumstances contemplated by G.S. 15A-2000(e)(7) and (e)(4) should not both be submitted to the jury. I would simply add that I can think of few situations in which the jury would *not* find, pursuant to G.S. 15A-2000(e)(7), that the "capital felony was committed to disrupt or hinder the lawful exercise of any governmental function or the enforcement of law" if that circumstance were submitted to them. In order to prevent an automatic accumulation of aggravating circumstances, which our legislature obviously did not intend, I should think that trial judges would rarely submit this circumstance to the jury.

As I understand it, the majority today also attempts to establish the following guidelines:

(1) *Based on the facts of the particular case*, prejudicial error in submitting an aggravating circumstance to the jury occurs when (a) the submission is erroneous, (b) the jury finds that cir-

State v. Goodman

cumstance to exist, and (c) there is a *reasonable possibility* the erroneously submitted circumstance might have contributed to the decision.

(2) The aggravating circumstance provided by G.S. 15A-2000(e)(3), which provides for aggravation where "defendant had been previously convicted of a felony involving . . . violence to the person" contemplates that (a) defendant shall have been *convicted*, not merely charged or indicted, of a felony as a result of conduct occurring *prior to* the events out of which the capital felony charge arose and (b) the felony for which defendant was convicted involved the "use or threat of violence to the person," *i.e.*, conviction for a crime against property may not be submitted under this subsection.

(3) The aggravating circumstance contemplated by G.S. 15A-2000(e)(5), which provides that "the capital felony was committed . . . in the commission of, or an attempt to commit, . . . any robbery, rape, arson, burglary, kidnapping, or aircraft piracy or the unlawful throwing . . . of a destructive device or bomb," may be appropriately submitted to the jury only when the defendant is convicted of first degree murder upon the theory of premeditation and deliberation. Put another way, if the defendant is convicted only on the basis of the felony-murder rule, this circumstance may not be submitted to the jury as an aggravating circumstance.

(4) In order to avoid the aggravating circumstance contemplated by G.S. 15A-2000(e)(9), which provides for a crime "especially heinous, atrocious, or cruel," from becoming a "catch-all" division which could always be employed in cases where there is no evidence of other aggravating circumstances, the trial judge must explain that the expression "heinous, atrocious, or cruel" anticipates an *especially* brutal murder where the brutality exceeds that normally present in any killing. Such brutality shall be limited to acts done to the victim during the commission of the capital felony itself. Here, the majority expressly approved the instructions of the trial judge with respect to this aggravating circumstance and quoted the Florida court's definition as the "conscienceless or pitiless crime which is unnecessarily torturous to the victim." *State v. Dixon*, 283 So. 2d 1, 9 (Fla., 1973). *See also Proffitt v. Florida, supra* at 255-56.

(5) The aggravating circumstance provided by G.S. 15A-2000 (e)(4), a capital felony committed to avoid a lawful arrest, contemplates more than merely killing the victim. Before this aggravating circumstance may be submitted to the jury, the evidence must establish that at least one of the *motivating factors* leading to the killing was defendant's desire to avoid apprehension for his crime. Put another way, the mere fact of the victim's death will not alone invoke this factor. There must be some evidence of a manifest intent to avoid arrest and detection.

(6) The legislature did not intend, in providing the mitigating circumstance contemplated by G.S. 15A-2000(f)(6), where defendant's capacity "to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was impaired," that intoxication, however slight, should be a mitigating circumstance. When the defendant contends that his faculties are impaired by intoxication, the intoxication must be to such a degree that it affects defendant's ability to understand and control his actions.

(7) Under G.S. 15A-2000(f)(9), which provides for "[a]ny other circumstance arising from the evidence which the jury deems to have mitigating value," there can be no restriction on the jury's consideration of any factor relevant to the circumstances of the crime or the character of the defendant. However, in instructing the jury, the trial judge "is not required to sift through the evidence and search out every possible circumstance which the jury might find to have mitigating value." *State v. Goodman*, *supra* at 34, 257 S.E. 2d 569, 590 (1979).

(8) The trial court should *not* instruct the jury that the jury might recommend a sentence of life imprisonment *even though* it finds aggravating circumstances to outweigh those in mitigation. To allow such discretion would be a return to the unfettered days prior to *Furman v. Georgia*, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed. 2d 346 (1972).

(9) The review function given to this Court by G.S. 15A-2000 (d)(2) is to be employed only in those cases where both phases of the trial of a defendant have been found to be without error.

While the majority has addressed the guidelines enumerated above, we are remanding for a new sentencing hearing here

because of *one error* by the trial judge with respect to the submission of *one* of the aggravating circumstances found present by the jury. The Court found that error was not harmless. With this portion of the Court's holding, I do not fully agree. Practically, I consider the error a harmless one. The jury found four other aggravating circumstances present including a finding that this capital felony was especially heinous, atrocious, or cruel. It found only one mitigating circumstance. I would ordinarily in a situation like this probably find that the assigned error was harmless beyond a reasonable doubt. However, in these first cases interpreting our death statutes and in more than an abundance of caution, I join the majority on the basis of the facts presented by this case.

## II. *State v. Cherry*

### A.

In *Cherry*, defendant was found guilty of first degree murder under the felony-murder rule. The evidence established that he was in the process of robbing a store when the murder was committed. At the sentencing stage, the jury found these statutory aggravating circumstances:

(1) Defendant had been previously convicted of a felony involving the use or threat of violence to the person. G.S. 15A-2000(e)(3).

(2) The capital felony was committed while the defendant was engaged in the commission of robbery. G.S. 15A-2000 (e)(5).

(3) The murder was committed for pecuniary gain. G.S. 15A-2000(e)(6).

The jury answered negatively the following questions posed with respect to aggravating circumstances:

(1) Was the murder especially heinous, atrocious, or cruel? G.S. 15A-2000(e)(9).

(2) Did the defendant knowingly create a great risk of death to more than one person by means of a weapon or device which would normally be hazardous to the lives of more than one person? G.S. 15A-2000(e)(10).

State v. Goodman

The jury found none of the four submitted mitigating circumstances:

(1) The capital felony was committed while the defendant was under the influence of mental or emotional disturbance. G.S. 15A-2000(f)(2).

(2) The capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was impaired. G.S. 15A-2000(f)(6).

(3) The age of the defendant at the time of the crime. G.S. 15A-2000(f)(7).

(4) Any other circumstance arising from the evidence which the jury deems to have mitigating value. G.S. 15A-2000(f)(9).

Again, the holding in *Cherry* is narrow. Specifically, the majority holds that a new sentencing hearing is necessary when the trial court erroneously submits to the jury at the sentencing phase of the trial the aggravating circumstance concerning the underlying felony pursuant to G.S. 15A-2000(e)(5), when that underlying felony has already been used to establish the offense as a capital felony at the guilt phase of trial. The rule would not apply, of course, as in *Goodman*, when the defendant is convicted of first degree murder as a result of premeditation and deliberation as well as the felony-murder rule. This formalizes the guideline presented in *Goodman* discussed *supra.*

With respect to whether the assigned error was harmless, I join the majority for the limited reasons stated in the discussion of Goodman, *supra.* However, and also for the same reasons stated in *Goodman*, I am unwilling to say that such error will always constitute prejudicial error. Here, the jury found two other aggravating circumstances and no mitigating circumstances.

I join with the majority in finding that the underlying felony should not be considered as an *aggravating circumstance* at the sentencing stage for the felony murder. However, I am concerned that this holding might be construed too broadly. We are not holding that the jury is to ignore the crime for which the defendant was convicted. Obviously, the underlying felony may be, and should be, considered by the jury in the sentencing phase. G.S.

15A-2000(a)(3) provides in part that it is unnecessary to resubmit evidence at the sentencing stage which was presented during the guilt determination phase unless a new jury is impaneled, "*but all such evidence is competent for the jury's consideration in passing on punishment.*" (Emphasis added.) It is clear, therefore, that the jury may consider the underlying robbery or other felony in the sentencing phase. What our holding here prohibits is simply that the underlying felony cannot be submitted to the jury as an *aggravating circumstance*. This is so for the reasons clearly explained in the majority opinion: It would be patently unfair for a defendant convicted of first degree murder by virtue of the felony-murder rule to start with one aggravating circumstance against him while a defendant convicted on the basis of premeditation and deliberation would start with no aggravating circumstances against him. Again, however, we ought to note that the legislature has attached special significance to murder committed in the course of commission of robbery and other felonies and the jury is surely allowed to consider that fact in making their sentencing recommendation.

### III. *State v. Johnson*

#### A.

In *Johnson*, defendant pleaded guilty to murder in the first degree which was committed in the course of a rape. The majority opinion notes that there was ample evidence of premeditation and deliberation. The jury found, beyond a reasonable doubt, the following aggravating circumstances:

(1) The capital felony was committed while the defendant was engaged in the commission of, or attempt to commit, rape. G.S. 15A-2000(e)(5).

(2) The capital felony was especially heinous, atrocious, or cruel. G.S. 15A-2000(e)(9).

The jury then found that the following mitigating circumstances existed:

(1) The defendant had no significant history of prior criminal activity. G.S. 15A-2000(f)(1).

(2) The capital felony was committed while the defendant was under the influence of mental or emotional disturbance. G.S. 15A-2000(f)(2).

The jury did *not* find the following mitigating circumstances which were submitted to it:

(1) The capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was impaired. G.S. 15A-2000(f)(6).

(2) Any other circumstances arising from the evidence which the jury deems to have mitigating value. G.S. 15A-2000(f) (9).

The jury then found that the mitigating circumstances were insufficient to outweigh the aggravating circumstances and, beyond a reasonable doubt, that the aggravating circumstances were sufficiently substantial to call for imposition of the death penalty.

B.

The majority opinion establishes the following:

(1) In some cases in which the defendant relies on the mitigating circumstance contemplated by G.S. 15A-2000(f)(6), the trial judge must include in his instructions to the jury on this statute the following:

a. An explanation of the difference between defendant's capacity to *know* right from wrong and the *impairment* of his capacity to appreciate the criminality of his conduct. That is, while defendant might have known that his conduct was wrong, he might not have been able to appreciate, *i.e.*, to fully comprehend, or be fully sensible of its wrongfulness. Moreover, while his capacity to so appreciate the wrongfulness of his conduct might not have been totally obliterated, it might have been impaired, *i.e.*, lessened or diminished.

b. An explanation that the jury should find this mitigating factor if it believed that defendant's capacity to conform his conduct to the law, *i.e.*, his capacity to refrain from illegal conduct, was impaired. This does not mean that defendant must wholly lack all capacity to conform. It means only that such capacity as

he might otherwise have had in the absence of his mental defect is lessened or diminished because of the defect.

I do not believe that these instructions are required in those instances in which the defendant attempts to invoke the mitigating circumstance provided by G.S. 15A-2000(f)(6) on the basis of defendant's intoxication. As I understand it, this holding is applicable only to mental impairments and diseases such as schizophrenia, conditions not readily understood by the average layman.

(2) If a defendant makes a timely request for a listing in writing of any mitigating circumstances pursuant to G.S. 15A-2000(f)(9) which are supported by the evidence and if these circumstances are such that the jury could reasonably deem them to have mitigating value, the trial judge must put such circumstances on the written list submitted to the jury. It will not be prejudicial error for the judge to fail to do so, however, if the defendant fails to request the judge to submit them.

(3) The burden of persuading the jury on the issue of the existence of any mitigating circumstance is upon the defendant and the standard of proof shall be by a preponderance of the evidence. Where, however, all of the evidence in the case, if believed, tends to show that a particular mitigating circumstance does exist, the defendant is entitled to a peremptory instruction on that circumstance. In order to be entitled to such an instruction, however, defendant must timely request it.

(4) The State and the defendant may not enter into a plea bargain whereby the defendant may plead guilty to first degree murder in return for a life sentence and thus avoid a potential death sentence imposed by a jury convened under G.S. 15A-2000.

(5) If the defendant requests it, the trial court, in addition to other approved instructions with respect to the aggravating circumstance contemplated by G.S. 15A-2000(f)(9), should instruct the jury that not every murder is *necessarily* "especially heinous, atrocious, or cruel" in the sense these words are used in the statute.

In summary, the majority opinion remands for a new sentencing hearing because of the trial court's failure to fully explain one of the mitigating circumstances enumerated in G.S. 15A-2000(f). I

State v. Goodman

can think of no more difficult instruction required of a trial judge than explaining a statute dealing with the human mind. In the absence of any guidance, perhaps this able trial judge felt more confident to rely on the legislative language. I can appreciate the problem with which he was confronted. However, it is abundantly clear that our legislature has mandated that the state of the mind of the defendant shall be given serious consideration by the jury in determining whether the death penalty should be imposed. It therefore becomes incumbent upon this Court to devise for the trial judges' guidance an understandable explanation for jurors of the legislative intent. Justice Exum has presented an excellent analysis of this subsection in the majority opinion and it should be a workable guide for our trial courts in the future.

Some may justifiably consider impaired capacity to be the most important subsection in our death penalty statutes. I frankly doubt that our society could uphold the concept of capital punishment without it. While North Carolina chooses not to consider mere mental impairment with respect to determining a defendant's guilt, in a punishment so final, we must ensure that the jury give proper consideration to defendant's mental condition as presented by the evidence. The Court's holding today in *Johnson* goes a long way toward guaranteeing that consideration.

CONCLUSION

Each decision handed down today is, as has been repeatedly stated, based on its own particular facts. One decision is based on erroneous trial court instructions with respect to a mitigating circumstance which was properly submitted and two are based on the improper submission of an aggravating circumstance. These are narrow holdings. However, when viewed collectively, as I have attempted to do here, we find numerous guidelines, particularly in *Goodman*, which range far beyond the narrow results reached. While I formally concur with the narrow holding in *Goodman* and generally support the further enumerated guidelines, I must caution that I believe some of the latter are not necessary to the decision in this case. I therefore view today's interpretations of G.S. 15A-2000 which go beyond the narrow holdings required as tentative formats only, subject to closer investigation in the appropriate factual circumstance.