**STATE of Tennessee, Appellee,**

v.

**James David CARTER, Appellant.**

Supreme Court of Tennessee,
at Knoxville.

June 9, 1986.

Application for Permission to Appeal
Denied by Supreme Court
June 2, 1986.

Mindy Norton Seals, Douglas R. Beier, Morristown, for appellant.

W.J. Michael Cody, Atty. Gen., William Barry Wood, Asst. Atty. Gen., Nashville, for appellee.

## OPINION

FONES, Justice.

This is a direct appeal of a death penalty case where in the jury found defendant guilty of murder in the first degree. At the sentencing hearing the jury found two aggravating circumstances, the murder was committed for the purpose of avoiding, interfering with or preventing a lawful arrest or prosecution of defendant and was committed while the defendant was engaged in committing larceny and kidnapping. The jury found no mitigating circumstances and sentenced defendant to death by electrocution.

This murder was committed in Hamblen County but defendant was tried in Greene County. The trial judge granted defend-

ant's motion for a change of venue based upon publicity about the trial of defendant for crimes committed in nearby counties and a Morristown newspaper article reporting that defendant had been accused of stabbing another prison inmate.

The victim was C.A. Lile, of Bethany, Oklahoma. His body was found on February 17, 1984, at a place on Cherokee Lake called "The Bluffs," just off Highway 25 E. A telephone company employee stopped at "The Bluffs" to eat his lunch, walked over to the edge of the cliff to look at the lake and saw the body lying on a lower rocky ledge at the edge of the water. If the body had rolled another foot it would have gone into the lake. Mr. Lile, who worked for Auto Driveaway, had driven a vehicle from Oklahoma to Virginia and on February 16, 1984, was returning to Oklahoma in a GMC pick-up truck. He had the misfortune of stopping at a rest stop on Interstate 81 in Greene County, north of Baileyton, shortly after midnight where defendant and his accomplice, Danny Price were casing the area for a vehicle to steal to use in a food store robbery the next day.

Michael Garber was the maintenance man at the Interstate 81 rest stop on the midnight to eight thirty a.m. shift. He observed defendant and Price milling around the area and kept an eye on them because there had been recent reports of thefts from cars. Later he saw one of the two leave the area with a third party in a pick-up truck.

Danny Price testified that he arrived in Morristown on February 7, 1984, after his release from a federal prison in Indiana. Price and defendant, whom he had known for twenty-five years, spent a great deal of time together during the ensuing ten days. After relating many of their activities, Price testified they drove to the Interstate 81 rest stop in defendant's brown Chevette, arriving about eleven thirty p.m. on February 16 for the purpose aforesaid.

Price spent most of the waiting time there sitting in the Chevette as he was under instructions to follow defendant if he left in another vehicle. After a while he saw defendant go inside the restroom and return shortly with a man he had seen arrive in a GMC pick-up. Price saw them enter the truck and leave the area with defendant as the passenger. He followed them to "The Bluffs" on Cherokee Lake. He had kept some distance behind, and as he arrived defendant and Lile were standing at the side of the truck when Lile went down "as if he had been hit." Price did not hear the first shot but saw and heard defendant shoot Lile three times after he was on the ground. Price testified that defendant dragged Lile's body over to the edge and rolled it off the cliff. When he asked defendant, "What is going on?", defendant said, "Get in the car and follow me."

They drove to an area near Cocke County, left the truck and returned to Morristown in the Chevette. The next day defendant came to Price's motel. They decided to abandon the food store robbery. Defendant wanted to get rid of the pick-up truck and Price agreed to help. Carter took all of the papers and personal belongings of Lile to burn or otherwise dispose of, and Price took the truck and had it washed and vacuumed.

Price testified that he promised defendant he would bring the truck to his motel in Newport, Saturday morning, February 18. Friday night he drove to Newport with his girlfriend and went to the combination steak house, bar and motel where defendant lived. Defendant's car was parked there but they did not see him that evening. They ate and drank until closing time, about twelve or one, and left in the pick-up truck. Price testified that he was drunk, ran off the road and turned the truck over. He was arrested and taken to the Cocke County Jail about one thirty a.m. on February 18 and charged with driving while intoxicated. Defendant came to the jail Saturday morning and posted a cash bond of $468.25 for Price's release. Defendant wanted to know what had happened to the truck. When Price told him he had wrecked it and it was probably in bad shape, defendant cursed and said, "I had to kill a person for that truck."

Price testified that he and defendant were riding around Saturday night, February 18, that defendant gave him the .32 revolver and put him out at the Cornet Boat Dock, and that defendant was to have returned later. Price was arrested at the boat dock by Grainger County officers.

The Grainger County Sheriff's Department notified the TBI and Hamblen County officers that they had arrested Price and that he had in his possession a .32 Rossi revolver. A TBI agent and the officers from Hamblen County assigned to investigate the murder of C.A. Lile went to Grainger County and interviewed Price at 10:45 a.m. on Sunday, February 19. Price told them he had been drunk since returning to Morristown from federal prison and denied any knowledge of a murder. However, he asked for time to think and told them when they returned they would not be disappointed.

They began interviewing him again about 6:30 p.m. on February 19, and he gave a statement that omitted the events at the Interstate 81 rest area and his witnessing a murder. However, at 9:35 p.m. on the same date, Price gave a second statement that was substantially the same as his trial testimony.

A firearms identification expert, Dr. Larry Miller, testified that he compared the four bullets removed from Lile's body with two bullets fired from a .32 Rossi revolver. Two of the four bullets removed from the victim's body were distorted to the extent that they could not be adequately compared, but the other two bullets were positively identified as having been fired from the .32 Rossi revolver to the exclusion of any other gun in the world.

Keith Turner, the owner of Turner's Market at Talbot, testified that defendant came to his store on the morning of February 17, 1984, and asked to borrow some money for medicine and gas. Turner knew defendant was a diabetic, but he was in a bind and did not have any money to lend to defendant, who then asked if he had that gun that "that woman brought back." Turner had it and gave it to defendant to

pawn and return. The gun was a .32 Rossi revolver.

Mike Turner, Keith Turner's son, testified that defendant came to Turner's Market on Sunday morning, February 19, 1984, before the store opened at noon. Defendant asked Mike to tell his father that the gun he had borrowed had been taken from his car but that defendant would pay for it.

The defense, through cross examination, brought out that Price had six felony convictions: four for forgery, one for larceny after trust, and one for assault with intent to commit murder. It was also revealed that for his involvement in the Lile murder a plea bargain agreement had been made with the State that on his plea of guilty to second degree murder, he would receive a thirty-five year sentence.

A defense witness testified that defendant had purchased a battery and an alternator for his Chevette on February 17, 1984, the day after the murder. A resident of the motel where defendant lived testified that defendant had been having trouble starting his car and she had used her jumper cables to start it several times. She testified that she saw defendant park his car and go to his room between 9:30 p.m. and 10:00 p.m. on Thursday night, February 16, 1984, and did not hear him leave or start his car after that.

▪ Defendant asserts that the evidence was insufficient to support a finding of his guilt beyond a reasonable doubt. Defendant argues that there was insufficient corroboration of the testimony of Price, defendant's accomplice, and that without Price's testimony there was no proof that defendant murdered Lile.

Price was an accomplice as a matter of law in the murder of C.A. Lile. A conviction may not be based upon an accomplice's testimony unless there is some fact testified to entirely independent of the accomplice's testimony which taken by itself leads to an inference, not only that a crime has been committed, but that the accused is implicated in the crime. *Mathis v. State,* 590 S.W.2d 449, 455 (Tenn.1979). The cor-

roborative evidence may be direct or entirely circumstantial and it need not, of itself, be adequate to support a conviction. It is sufficient to meet the requirements of the rule if it fairly and legitimately tends to connect defendant with the commission of the crime charged. *Sherrill v. State*, 204 Tenn. 427, 321 S.W.2d 811, 815 (1959).

It is our opinion that there was ample evidence corroborating the testimony of Price. Keith Turner testified that he loaned defendant the .32 Rossi revolver used to commit the murder the morning of February 17, which was twelve hours or more before the murder was committed. Mike Turner testified that defendant came to the store Sunday morning and left the message for his father that the gun had been taken from his car.

Michael Garber, the Interstate 81 rest area maintenance man, positively identified Price and defendant as two persons he observed while performing the first cleaning operation he did every night starting at midnight; that one of the two left in a pick-up truck that had a temporary license tag with a third man who wore glasses and a sweater and who had arrived in that pick-up truck. Lile was wearing a camel colored sweater with three bullet holes in the back when his body was found.

Price's testimony was corroborated by the fact that the body was found where he said the murder took place in his 9:30 p.m. statement on February 19. Numerous other details that he gave the officers that night about his and the defendant's activities were verified by a number of witnesses whose names he gave the officers, including Keith Turner as the lender of the gun.

We find that the evidence of defendant's guilt fully satisfied the standard prescribed in *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), and T.R. A.P. 13(e).

■ Defendant insists that it was prejudicial error to permit the State to introduce evidence that (1) defendant committed an armed robbery of a market on February 8, 1984; (2) defendant sold a .380 gun to Alva Day and that this gun was the weapon used in the armed robbery of February 8, 1984; (3) the vehicle identification number on defendant's automobile had been removed; and (4) defendant intended to commit another robbery in Cocke County.

We agree with defendant that the trial court erred in allowing Price to testify that he and defendant had robbed a Bi-Lo Market in Jefferson County on the night of February 8, 1984, and that they had used a .380 revolver and had taken about $3,000 in the robbery. The trial judge apparently considered that evidence admissible under the exceptions to the inadmissibility of other crimes of identity and common scheme or plan.

We have discussed the admissibility of other crimes independent of the crime on trial in many cases; and while no significant controversy surrounds the statement of the rule and its many exceptions, the application of the exceptions remains intractable. *See, e.g., State v. Parton*, 694 S.W.2d 299 (Tenn.1985), and *Bunch v. State*, 605 S.W.2d 227 (Tenn.1980).

The common scheme or plan label embraces three categories of other crimes briefly identified in Paine, *Tennessee Law of Evidence* § 7 (Supp.1981), as, "(1) distinctive design or 'signature' crimes; (2) a larger, continuing plan or conspiracy; and (3) a common or connected or inseparable plan or transaction, sometimes referred to as the 'same transaction.'" To qualify as a signature crime, the modus operandi employed in the crime on trial and the other crime must be so unique and distinctive as to be like a signature. The only similarity in the manner of performance of the Bi-Lo robbery and the murder was that Price was an accomplice in the two crimes. That similarity does not qualify the Bi-Lo robbery and the Lile murder as signature crimes likely committed by the same person.

The larger continuing plan category is marked by a common goal or purpose toward which each crime is directed. Paine, *Tennessee Law of Evidence* § 7 (Supp. 1981). *Strickin v. State*, 497 S.W.2d 755

(Tenn.1973), exemplifies this type of other crime. Mrs. Stricklin was on trial for the murder of her father-in-law by feeding him jello laced with arsenic. The other crime offered and objected to was that she had attempted to murder her mother-in-law during the same time frame as the events of the crime on trial by feeding her jello laced with arsenic, causing illness from which she recovered. Again, the Bi-Lo Market robbery does not fit the larger continuing plan category. It was performed on February 8, and the murder was performed on February 17, the only common denominator being the participation of Price.

The common, connected or inseparable transaction category is illustrated by *Claiborne v. State*, 555 S.W.2d 414 (Tenn.Crim. App.1977), and *Carroll v. State*, 212 Tenn. 464, 370 S.W.2d 523 (1963).

In *Claiborne v. State, supra* the person who committed the crime on trial entered a truck stop in McMinn County about 3:00 a.m. on August 20, 1975, asked the cashier for change, then walked to a table where a uniformed deputy sheriff was sitting, put a gun to the back of his neck, ordered him not to move, disarmed him and fired a fatal shot into his neck.

The other crime took place at an Exxon station in Knox County beginning two hours earlier and continuing for approximately one hour. At the Exxon station defendant had asked for change for ten dollars and when refused, pulled a gun on the operator and demanded all of his money. Defendant was not satisfied with the amount and threatened to kill the operator if he could not come up with one hundred dollars. Keeping his gun out of sight, he remained at the station and monitored the operator's activities as he waited on customers. Suspecting the operator of having told a customer to call the police, he repeatedly told the operator that he hoped a policeman would show because he wanted to kill him and the operator too. About one hour after arriving at the Exxon station, defendant locked the operator in the restroom under threat of death if he did not remain there, and departed.

In *Carroll v. State, supra,* defendant was on trial for raping the occupant of 621–D in Hurt Village, Memphis, after entering by cutting the screen and raising a window. After defendant left, the police were called and, while examining the screen and window defendant used for entry into apartment 621–D, noticed that the screen on an adjoining apartment had been cut. The officers went to apartment 621–F and arrested defendant who was engaged in raping the occupant of that apartment, Mrs. Sneed. Mrs. Sneed's testimony about the other crime was objected to, but its admission by the trial judge was sustained by this Court.

The *Carroll* Court cited *Mays v. State,* 145 Tenn. 118, 238 S.W. 1096 (Tenn.1921), for the proposition that when two distinct offenses are so inseparably connected that proof of one necessarily involves proving the other as a part of the same transaction, evidence of the other crime is admissible. The Court held that the offense testified to by Mrs. Sneed was "so connected with those of the crime on trial as to be part of one and the same transaction, that both were so related in time and circumstances that proof of one tended to elucidate and establish the other." 370 S.W.2d at 530.

The Bi-Lo Market robbery in Jefferson County on February 8 where a .380 revolver was used and the murder of C.A. Lile with a .32 Rossi at Cherokee Lake nine days later were not inseparably connected or part of the same transaction and contributed nothing of probative value to the identification of defendant as the person responsible for the murder.

■ Price's testimony that defendant sold Alva Day the .380 gun used in the robbery of the Bi-Lo Market was also erroneously admitted. However, the sale was probably not a crime and was not the type of bad act likely to produce prejudice in the minds of the jury against defendant. We find that error to be harmless beyond a reasonable doubt.

■ The evidence that the vehicle identification number had been removed from

the brown Chevette owned by defendant did not link him with the act. The alteration of a vehicle identification number is a prohibited offense,[1] and the State suggests no issue at trial that might bring it within the scope of one of the exceptions to the inadmissibility of other crimes. However, in our opinion it was clearly harmless error beyond a reasonable doubt.

■ Price's testimony that he and defendant planned to rob a food store in Cocke County and needed a clean car was the explanation given for going to the Interstate 81 rest area and looking for a vehicle to steal. Defendant's brown Chevette had been used in the Bi-Lo Market robbery. No other motive was expressed or could be implied from the evidence in this case for the activities of Price and defendant at the Interstate 81 rest stop or for the murder and attempt to dispose of the body in the lake. We think this evidence was properly admitted on the issue of motive for the theft of the GMC truck, the kidnapping and the murder of Lile. *See, McLean v. State,* 527 S.W.2d 76 (Tenn. 1975).

■ Defendant says that the trial judge committed reversible error in failing to grant his motion for a mistrial based upon a T.B.I. Agent testifying that "Mr. Price advised us that there was a matter of convict loyalty involved."

Defendant called T.B.I. Agent Rick Morrell as a witness for the defense in an attempt to show that Price had made prior statements inconsistent with those made at trial. The questions and answers relevant to this issue follow:

Q Did he also tell you that he was unwilling to talk with you and Chief Deputy Long at that time, but if you would come back later in the evening, you would not be disappointed?
A At first Mr. Price advised—or denied any knowledge of the homicide.
Q Would you just answer that question, though, did he tell you that if you and Chief Deputy Charles Long would come back later in the evening, you would not be disappointed?
A Uh, yes he did.
Q Thank you.
A But—Your Honor, may I elaborate on that?
THE COURT: You certainly may.
A In addition to that, Mr. Price advised us that there was a matter of convict loyalty involved.

Defendant requested a bench conference, which the trial judge denied. The court, however, immediately gave the following instruction to the jury:

THE COURT: I think you need to stop with that. Members of the jury, if there is any adverse implication by convict loyalty, you must not consider that as to the defendant. There is no evidence of the defendant having ever been convicted of any crime or being a convict at any place or any time, and you will not consider that, as a matter of fact, you will consider that he has not ever been a convict at any time or any place.

Later, out of the presence of the jury, the trial judge allowed defendant to present and argue grounds for a mistrial based upon Morrell's use of the phrase "convict loyalty." We are convinced that Morrell's use of that phrase was not an intentional effort to get something prejudicial before the jury. We think the inadvertent use of this ambiguous phrase followed by a prompt positive instruction on the part of the trial judge rendered Morrell's answer harmless beyond a reasonable doubt.

■ There remains for consideration before leaving the guilt phase of the case the question of whether the erroneous admission of the evidence of the Bi-Lo Market robbery was prejudicial or harmless error. In the totality of the circumstances of this case, the jury legitimately learned that Price and defendant were engaged in similar illegal activity. Thus, the Bi-Lo Market robbery evidence did not add a new

---

1. See T.C.A. §§ 55–5–111 and 112.

dimension to the jurors' view of defendant. Price's second statement, and his testimony at trial was straight-forward, consistent, uncontradicted, adequately corroborated and has been accredited by the jury. In that circumstance we have direct eye-witness evidence that defendant Carter committed the murder of C.A. Lile. The line between harmless and prejudicial error is in direct proportion to the degree of the margin by which the proof exceeds the standard required to convict beyond a reasonable doubt. *Delk v. State*, 590 S.W.2d 435, 442 (Tenn.1979). The proof of Carter's guilt is overwhelming, and we find this error harmless beyond a reasonable doubt.

■ Defendant contends that the circumstances of Michael Garber's initial identification of defendant to law enforcement officers was so impermissibly suggestive that Garber's in-court identification of defendant should have been suppressed. A suppression hearing was held on November 7, 1984, five days before the trial began. The proof adduced at that time revealed that on July 10, 1984, almost five months after the murder, T.B.I. Agent Rick Morrell and Investigator Tom Shell interviewed Garber at a garage where he was then working. They showed him ten photographs that included pictures of Price, Lile and defendant and also of the GMC truck and defendant's brown Chevette and asked him if he had ever seen any of those people before. His response was that he recognized the three persons and that they had been present at the rest stop on Interstate 81 on the same night. Garber testified at the suppression hearing that at the time he first saw the pictures and told the investigators that he recognized all three of the men he did not know what they were there for. He said that he was cleaning the lobby of the building which had large glass windows and two of the men in the pictures were there for more than an hour and he recalled them standing next to the flagpole in a well-lighted area only thirty to thirty-five feet from his position in the lobby of the building.

Garber could not identify the vehicles, but he did recall seeing Lile arrive in a pick-up truck. The remainder of his testimony was the same as he gave at trial, the substance of which has been related hereinabove.

The principal dangers of misidentification arise from a photographic display where the witness is shown the picture of a single individual the police are seeking to identify or where a photograph of a single individual is in some way emphasized among pictures of several persons. That did not occur here. Garber was not asked to identify a single individual whom he knew was a suspect in the commission of a crime, which is the usual circumstance under which questionable identification procedures arise. *See Simmons v. United States*, 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968). We doubt that the photographic procedure followed here was sufficiently suggestive to require an examination of the totality of the circumstances test in passing upon the admissibility of Garber's in-court identification of defendant. But, assuming a suggestive procedure, Garber passes the misidentification tests.

In *Bennett v. State*, 530 S.W.2d 511 (Tenn.1975), we traced the development of the totality of the circumstances rule in United States Supreme Court cases and adopted the tests prescribed in *Neil v. Biggers*, 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972), for evaluating the likelihood of misidentification, as follows:

> the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation.

409 U.S. at 199, 93 S.Ct. at 382.

With respect to Garber's opportunity to view defendant, Lile and Price, he was able to see defendant and Price through the glass windows and doors of the building as he cleaned the lobby. Although it was

night, Price and defendant were standing near the flagpole in a well-lit area only thirty to thirty-five feet from Garber. He observed them for more than one hour. Garber was twenty-seven years of age with no indication that he had any vision problems.

With respect to his degree of attention, he testified that there had been thefts at the rest area and that it was part of his job to report anything he saw and to identify persons acting suspiciously around the rest area. Although he was unable to give full descriptions of the clothing worn by the three men that night, Garber emphasized that he "was looking just mainly to see their faces where if anything did come up stolen I could give a fairly well [sic] description or if I seen them again I could identify them."

With respect to the accuracy of a prior description of the person to be identified, no one had contacted Garber for an identification or description prior to July 10.

Garber's level of certainty at the confrontation on July 10 was unhesitatingly positive that he had seen all three of the men on the same night at the rest area. It is true that he could not describe the clothes they were wearing except that Lile was wearing a sweater and could not recall the date, but did remember that it was cold the night the three men were there.

The time between the crime and the confrontation of five months was longer than the time lapse in most cases. But considering the witness' age and focus on the unusual activity of defendant and Price in hanging around the rest area on a cold night at a time when he was on the lookout for thieves, we see little if any likelihood of misidentification arising from this factor.

Assuming that the identification procedure used when the officers first confronted Garber in July 1984 was to some extent suggestive, we hold that the procedure did not give rise to a substantial likelihood of irreparable misidentification and that under the totality of the circumstances, the in-court identification was reliable and independent of any previous suspect identifica-

tion. *See Rippy v. State,* 550 S.W.2d 636 (Tenn.1977), and *Bolton v. State,* 617 S.W.2d 909 (Tenn.Crim.App.1981).

■ In his amended motion for a new trial, defendant asserted that the jury failed to follow the instruction of the trial court that they should attach no significance to his failure to testify. Defendant's insistence upon a new trial on the basis that his constitutional right to remain silent had not been honored by the jury was supported by a newspaper article containing the following sentence: "Some of the jurors commented Carter gave no defense to the charges and said they may have felt differently if the man had testified." In addition, one of the defendant's attorneys filed an affidavit asserting that one of the jurors had told her that the jurors kept asking the question, "Why did the defendant not testify?"

In *State v. Blackwell,* 664 S.W.2d 686 (Tenn.1984), we adopted Federal Rule of Evidence 606(b), which provides as follows:

> b. Inquiry into validity of verdict or indictment.—Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon his or any other juror's mind or emotions as influencing him to assent to or dissent from the verdict or indictment or concerning his mental processes in connection therewith, except that a juror may testify on the question of whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror. Nor may his affidavit or evidence of any statement by him concerning a matter about which he would be precluded from testifying be received for these purposes.

Clearly whatever questions or comments were interchanged between the jurors respecting defendant's failure to testify falls squarely within the prohibition of the rule, not its exceptions. It was a matter or

statement occurring during the course of the jury's deliberation and its effect was upon the mind or emotions alleged to have influenced the verdict. It was neither extraneous, prejudicial information nor an outside influence improperly brought to bear upon any juror. *See also Montgomery v. State,* 556 S.W.2d 559 (Tenn.Crim. App.1977).

■ Defendant asserts error in the failure of the trial judge to recharge the statutory elements of robbery, larceny and kidnapping.

At the conclusion of the guilt phase of the trial the Court charged the statutory elements of all three of those crimes. The jury returned its verdict of guilty of murder in the first degree at 8:09 p.m. and the court recessed for the day. Neither the State nor defendant put on any proof at the sentencing hearing the next morning. The trial judge told the jury that both sides could present additional evidence but had decided to rely on the evidence presented at trial. Whereupon the court charged the jury on the punishment for first degree murder and they retired to deliberate at 9:37 a.m. and returned their verdict at 11:31 a.m.

We recently held in *State v. Williams,* 690 S.W.2d 517 (Tenn.1985), that it was error to fail to give the statutory definition of the felonies which the jury was asked to consider in determining whether it should find the existence of the aggravating circumstance defined in T.C.A. § 39–2–203(i)(7). The felony involved in *Williams* was robbery and the opinion is silent as to whether the statutory definition of robbery was given during the guilty phase.

In this case the jury had been given the statutory definition of larceny, robbery and kidnapping the day before they retired at 9:37 a.m. to consider the punishment. We think it is significant that they eliminated robbery from their finding of aggravated circumstances under T.C.A. § 39–2–203(i)(7). The definition of that crime includes the element of forcible taking from the person of the victim. The proof in this case was that the victim's wallet was found

on his person with cash undisturbed and in addition cash was found clipped to a clipboard in the seat of the pick-up truck. Price testified that defendant took nothing from the person of Lile after killing him and before throwing him over the cliff. This demonstrates that the jury had clearly in mind the elements necessary to convict of the crime of the felony of robbery and quite properly declined to include it. It was patently obvious that defendant was guilty of the larceny of Lile's truck and kidnapping him from the Interstate 81 rest stop. We find this situation distinguishable from *Williams* and harmless.

■ Next defendant insists that the trial court should have instructed the jury that the second statutory aggravating circumstance, T.C.A. § 39–2–203(i)(6), would not apply unless they found that defendant's sole motive in committing the murder was to avoid arrest or prosecution. Defendant cites two cases in support of his contention, *Menendez v. State,* 368 So.2d 1278 (Fla.1979), and *State v. Goodman,* 298 N.C. 1, 257 S.E.2d 569 (1979). Those cases do not support defendant's assertion that avoiding arrest or prosecution must be the sole motive before that aggravating circumstance may be invoked. *Goodman* expressly says, "that at least one of the purposes motivating the killing was defendant's desire to avoid subsequent detection and apprehension for his crime." 257 S.E.2d at 586.

The evidence in this case clearly supports a finding that defendant's motive was to kill and dispose of Lile's body in Cherokee Lake to prolong discovery of his body and avoid detection and apprehension for the murder and the planned robbery to be accomplished in Lile's truck.

■ Defendant contends that the two aggravating circumstances that the jury found defendant was guilty of are based upon the same set of facts and thus provides an arbitrary basis for imposition of the death penalty. There is simply no merit to the proposition that those two aggravating circumstances are identical. A de-

fendant may commit murder during the commission of any one or any combination of the listed felonies without any intent or motive on his part to kill to avoid arrest or prosecution. On the other hand, murders are often committed without the commission of a listed felony and as part of the same episode acts are performed indicating a motive to avoid detection and prosecution for that killing. The fact that the commission by defendant of larceny of Lile's pick-up truck, his kidnapping, murder and attempted disposal of his body in the lake coalesced into a short time frame does not support defendant's contention of duplication in the legislative promulgation of those two aggravating circumstances or render their application to the facts of this case arbitrary or in any manner unlawful or prejudicial.

 Defendant asserts the trial judge instructed the jury to consider the mitigating circumstance that defendant "had no significant history of prior criminal activity" but that the jury was unfairly precluded from consideration of that mitigating circumstance because the court had erroneously allowed evidence of defendant's criminal activity during the guilt phase, heretofore discussed in this opinion.

The trial judge erroneously charged all of the mitigating circumstances listed in the Code, without a single shred of evidence appearing in the record in support of any one of said mitigating circumstances. We have repeatedly cautioned trial judges that this practice was erroneous. *See, e.g., State v. Buck*, 670 S.W.2d 600, 608 (Tenn. 1984). However, a defendant cannot be heard to complain about an instruction to the jury that was beneficial to him. *Whitwell v. State*, 520 S.W.2d 338, 344 (Tenn. 1975), and *Wattingham v. State*, 37 Tenn. 64 (1857). The mere suggestion that there might have been lurking somewhere in the evidence a scintilla of evidence in support of the statutory mitigating circumstances read to the jury—which is the probable result of the charge—and having no predicate in the evidence therefor, must be regarded as favorable to the defendant. This defendant had such an extensive prior criminal record that he was indicted but not prosecuted as a habitual criminal. When defendant's counsel mentioned out of the presence of the jury the mitigating circumstance of no substantial prior criminal record, the trial judge warned counsel that any effort on defendant's part to prove lack of a prior criminal record would permit the State to show in rebuttal the extensive crime record of defendant. This issue is patently frivolous.

 Last, defendant complains that the sentence of death imposed upon Carter was disproportionate in light of the sentence Price obtained through plea bargaining.

The State's theory, accredited by the jury, cast defendant as the trigger man who alone rolled Lile's body over the cliff, and Price as a passive participant with no evidence to indicate he was involved in planning or executing a murder or disposing of the body. In fact he testified that he and defendant went to the rest stop because they knew boy and girl friends often arrived there in two cars and left in one, leaving the other parked there for hours, presenting an ideal target for a car theft.

There was clearly a rational basis for the difference in sentences. We have approved death sentences in a number of death penalty cases where co-participants who would be technically as guilty as the principal offender have received a lesser punishment. *See, e.g., State v. Barnes*, 703 S.W.2d 611 (Tenn.1985); *State v. King*, 694 S.W.2d 941 (Tenn.1985); and *State v. Caruthers*, 676 S.W.2d 935 (Tenn.1984).

We have reviewed the sentence of death in accord with the mandates of T.C.A. § 39–2–205(c) and are satisfied that the evidence warrants imposition of that penalty.

The sentence of death will be carried out on the 11th day of September, 1986, unless stayed by appropriate authority. Costs are adjudged against defendant.

COOPER, HARBISON JJ., and FRANKS, S.J., concur.

BROCK, C.J., dissents (see separate opinion).

BROCK, Chief Judge, concurring in part; dissenting in part.

With respect to the constitutionality of the death penalty, I adhere to the views expressed in my dissenting opinion in *State v. Dicks*, Tenn., 615 S.W.2d 126, 132 (1981); in all other respects I concur in the opinion of the Court.

## OPINION ON PETITION TO REHEAR

### PER CURIAM.

A petition to rehear has been filed on behalf of defendant Carter, considered by the Court, found to be without merit, and is respectfully denied.