# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### Assigned on Briefs December 18, 2001

## STATE OF TENNESSEE v. STEVEN DAVID BROOKS

### Direct Appeal from the Criminal Court for Knox County
### No. 61817    Richard R. Baumgartner, Judge

---

### No. E2001-00920-CCA-R3-CD
### August 15, 2002

---

A Knox County jury convicted the Defendant of three counts of rape of a child and of two counts of rape. The trial court sentenced the Defendant to twenty-three years for each rape of a child conviction and to ten years for each rape conviction. All sentences were to be served concurrently, for an effective sentence of twenty-three years. The Defendant now appeals, arguing the following: (1) that the trial court erred by not severing the offenses involving different victims, (2) that the evidence presented at trial was insufficient to convict the Defendant of the charged offenses, and (3) that the cumulative error during the proceedings deprived the Defendant of a fair trial and due process of law. Concluding that the trial court's failure to sever the offenses was error and that the error was not harmless, we reverse the judgments of the trial court, sever the offenses by victim, and remand for new trials.

### Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Reversed and Remanded

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which JOSEPH M. TIPTON and THOMAS T. WOODALL, JJ., joined.

Aubrey L. Davis, Assistant Public Defender, Knoxville, Tennessee, for the Appellant, Steven David Brooks.

Paul G. Summers, Attorney General and Reporter; David H. Findley, Assistant Attorney General; Randall E. Nichols, District Attorney General; Kevin J. Allen, Assistant District Attorney General; Charme Johnson Knight, Assistant District Attorney General; Leland L. Price, Assistant District Attorney General; and Robert Headrick, Assistant District Attorney General, for the Appellee, State of Tennessee.

**OPINION**

The Knox County Grand Jury returned a presentment charging the Defendant, Steven David Brooks, with six counts of penetrating his stepdaughters, B.J.R.[1] and P.L.R., with his penis between July 1989 and April 1996. The Defendant made a motion to sever the counts involving B.J.R. from those involving P.L.R. The trial court denied the motion. A Knox County jury convicted the Defendant of three counts of rape of a child and of two counts of rape. The trial court sentenced the Defendant to twenty-three years for each rape of a child conviction and to ten years for each rape conviction. All sentences were to be served concurrently, for an effective sentence of twenty-three years. The Defendant now appeals, arguing the following: (1) that the trial court erred by not severing the offenses involving different victims, (2) that the evidence presented at trial was insufficient to convict the Defendant of the charged offenses, and (3) that the cumulative error during the proceedings deprived the Defendant of a fair trial and due process of law.

I. FACTS

Vivian Jean Brooks, the Defendant's former wife, testified that she has three children, a twenty-year-old daughter, B.J.R., a seventeen-year-old daughter, P.L.R, and a ten-year-old son. The two daughters were the victims in this case. Brooks testified that at the time of trial, her youngest daughter and her son were living at home with her and that her oldest daughter was in the Navy.

Brooks testified that she met the Defendant in 1987 or 1989, that the Defendant moved in with her, and that they married in 1990. Brooks stated that when the Defendant moved in, she was working as a cashier at Weigel's Store. She recalled that she worked there for about two years, and then after her son was born about two years later, she became a certified nursing assistant (CNA) and worked primarily in nursing homes. Brooks stated that towards the end of her marriage, she tried to work more nights so that the Defendant would have days to try to find a job. She also testified that she worked in home health care and would be away from home on many weekends. Brooks testified that "[w]hen [the Defendant] did work, he would work days." According to Brooks, at some point after her son was born, she and her husband separated because "there was a lot of fussing and fighting . . . constant fighting . . . and [she] couldn't take it anymore." Brooks also recalled that the Defendant "wasn't holding jobs" and "was pawning everything [they] had."

Brooks testified that after about a month of separation, she reunited with her husband "for [her] son's sake" because she wanted her son to have a father. Brooks stated that the Defendant took care of the children while she was at work. In April 1996, Brooks again separated from her husband "[b]ecause [she] found out that [the Defendant] had been molesting [her] girls." Brooks testified that after she left the Defendant, he was allowed supervised visits with their son; however, the Defendant visited only three times that year and then stopped visiting completely because he "did not want to

---

[1] It is the policy of this Court not to identify minor children involved in sexual abuse cases by name. Instead, we will identify the minor victims in this case by their initials.

pay the money or have the supervised visitation . . . through the Parent Place." Brooks reported that from the time the Defendant moved in until 1996, the family moved quite a bit.

On cross-examination, Brooks stated that when she met the Defendant, she was married and going through a divorce from Mr. Strader. Brooks had been married to Strader about a year. Brooks testified that the father of her daughters, Mr. Reckard, had been physically abusive towards her. Brooks testified that while the Defendant lived with her family, her daughters "were never particularly fond of him, but there was no reason for [Brooks] to suspect anything." Brooks acknowledged that both of her daughters are "strong-willed." According to Brooks, punishment for the children usually consisted of grounding them.

Brooks acknowledged that she and the Defendant had financial difficulties the entire time that they were married. Brooks testified that after her initial separation from the Defendant in 1994, she drew up a document entitled "Agreement for Second Chance" in which several issues were addressed that "would have to change" in order for the Defendant to move back in. Brooks maintained that she never discussed with the Defendant having an "open marriage."

Brooks stated that at one point B.J.R. was dating a boy who was about three or four years older than she. Brooks testified that the Defendant "may have" come to her and said that he had a problem with the age difference.

B.J.R., who was twenty years old at the time of trial, testified that she had been in the United States Navy for a year and a half and that she was enlisted for four years active duty and for four years reserve duty. B.J.R. recalled that the Defendant moved in with her family "about 1986 or so" when B.J.R. was six or seven years old. B.J.R. testified that the Defendant "was nice when he first moved in." However, she recalled that things changed. B.J.R. testified that money was scarce so her mother had to work longer hours.

B.J.R. testified one day when she was six or seven years old, she came home early and found the Defendant sitting on the couch watching television. According to B.J.R., the Defendant asked, "Do you want to see something?" After B.J.R. responded in the affirmative, the Defendant "undid his pants and showed [her] his penis." B.J.R. also recalled that on one occasion when she was eight or nine years old, she received a "C" on her report card, although she usually received "A's" and "B's." She stated that the Defendant "didn't make a big deal of it at first," but after her mother left for work that evening, the Defendant came into B.J.R's room and told her that she "deserve[d] to be in trouble" for the grades on her report card. B.J.R. testified that the Defendant told her that she could either "get a whipping" or "suck on [his] penis for like thirty seconds." Referring to the amount of time involved in each sexual encounter, B.J.R. explained that the Defendant would "give [them] times as [they] got older." B.J.R. testified that she "suck[ed] on his penis" because she did not like the belt. She stated that the Defendant did not ejaculate the first time.

B.J.R. reported that this activity eventually began to happen two or three times a week and that the Defendant "would find little things [that she and her sister] didn't do during the day" as a

reason to punish them. According to B.J.R., each time the Defendant had one of these "excuse[s,]" he would come into their rooms and tell them that they could "either get a whipping . . . or . . . suck on [his] penis." B.J.R. recalled that sometimes the Defendant would not give them the option and simply force them to suck on his penis.

B.J.R. testified that she never told anyone about the Defendant's behavior because he had told her that "no one was going to believe [her]" since she "was too little." B.J.R. stated that when the Defendant first began the abuse, he would usually keep his hands to his sides or smoke a cigarette. As B.J.R. started getting older, the Defendant "started grabbing the back of [her] hair . . . and holding onto that." She stated that the Defendant would not let go of her hair "until he was satisfied." B.J.R. testified that the Defendant had ejaculated in front of her, but he never did it in her mouth. She explained that she did not argue with the Defendant because at times "his eyes would be bloodshot and [he would] have . . . a real . . . wild look, and those were the nights that [they] didn't question anything he said to [them]." B.J.R. testified that she "knew he was going to do more" if she did not do what the Defendant asked.

B.J.R. recalled that when she was about thirteen or fourteen years old, the Defendant began to tell her that he was "grooming [her] to be the perfect wife" and that her husband "would thank him for everything he taught [her]." She testified that the Defendant would also make statements such as, "You are better than your sister," or "You need more practice."

B.J.R. testified that on one occasion while she was living with her grandmother on Baxter Avenue, she and her sister got into an argument in the living room which they were using as a bedroom at the time. B.J.R. stated that she and the Defendant then got into an argument, during which "he hit [her]" and she then threw her Walkman at him. According to B.J.R., when her mother went to work that evening, the Defendant came into her room and told her, "Due to you fighting with me earlier today, along with your sister, and the Walkman getting broke[n], you owe me." B.J.R. testified that the Defendant then said, "You have to suck on my penis. I am not giving you the choice of the belt this time." B.J.R. testified that she was sure that she was twelve years old during this incident because she remembered her mother telling her that she would buy B.J.R. a new Walkman for her thirteenth birthday.

B.J.R. testified that on another occasion when she was fourteen or fifteen years old, she was washing the dishes at the family's home in Montgomery Village, and she dropped a glass. B.J.R. stated that an argument ensued between her and the Defendant. According to B.J.R., she and the Defendant "had started getting in regular fights . . . all-out fistfights, hitting each other." B.J.R. testified that she said some things to the Defendant, and in return, he "smacked [her] and busted [her] lip." She recalled that later in the evening after her mother had gone to work, the Defendant came into her room, "and he didn't bring the belt again." B.J.R. reported that the Defendant said, "You have to do this . . . or you will be grounded." B.J.R. testified that she then sucked on the Defendant's penis.

B.J.R. testified that when she was a freshman in high school, she fell asleep while watching a movie at her boyfriend's house and did not return home until 10:30 p.m., thirty minutes after her curfew. B.J.R. stated that the Defendant came into her room later that evening and told her, "you can either get a whipping . . . or you can suck on my penis for . . . three or four minutes." She explained that the Defendant would use a clock to time the rapes and that if she did not perform for the full time that the Defendant set, he would give her a "whipping." B.J.R. testified that she sucked on the Defendant's penis that night. She stated that her family was living in Montgomery Village or Maryville Pike, and she was fifteen years old at the time.

B.J.R. testified that she did not tell her mother about what was happening because she was afraid and ashamed and because she "didn't want to be the one to ruin her [mother's] happiness." She also stated that her brother was her "heart and soul," and she did not want him to grow up without a father. B.J.R. recalled that in April 1996, she told her cousin, Tina, about the abuse. According to B.J.R., Tina told her to have B.J.R.'s mother call Tina when she got home and "that was when [they] told [B.J.R's mother]."

On cross-examination, B.J.R. testified that the abuse began in 1986, shortly after the Defendant moved in with her family. However, she stated that she could be wrong about the year, but maintained that she was in kindergarten when the Defendant moved in and started the abuse. B.J.R. testified that she was embarrassed to tell anyone about the abuse.

P.L.R. testified that at the time of trial, she was a senior in high school. P.L.R. stated that she was very young when the Defendant moved in with her family and that she did not like the Defendant because he was "mean and rude" and because "[h]e sexually abused [her] and [her] sister." P.L.R. recalled that she was six years old the first time she saw the Defendant's penis. She stated that the Defendant came into her room and asked her if she wanted to see something. P.L.R. testified that she responded in the affirmative, and the Defendant showed her his penis.

P.L.R. reported that the Defendant would ask her to "suck on his penis" or get a whipping when she did something wrong. She testified that the Defendant would ask her to suck on his penis "a few times a week, sometimes more" and that it would occur "[a]nytime of the day, morning, afternoon, or night." However, P.L.R. testified that it occurred more frequently at night because her mother was not home. She stated that when the Defendant had his penis in her mouth, he would put his hands behind her ears or pull her hair. P.L.R. testified that the Defendant often ejaculated into a hand towel in front of her and that on one occasion, the Defendant ejaculated in her mouth. P.L.R. recalled that the Defendant would say that he was doing the same thing to her sister and that her sister was "better."

P.L.R. testified that on one occasion when she was ten or eleven years old and her family was living in Montgomery Village, she and her brother were playing in a closet. According to P.L.R., the Defendant accused her of sexually molesting her brother and later told her that if she did not suck on the Defendant's penis, he would tell her mother and she would receive a spanking. P.L.R. testified that she sucked on the Defendant's penis.

P.L.R. also recalled a time when the family was living on Maryville Pike and the Defendant asked her to come into the bathroom to help him move a box. She testified that when she went into the bathroom, the Defendant instead asked her to suck on his penis so she would not get in trouble.

P.L.R. testified that when she was living in Christenberry, she told her best friend, Missy, about what was happening, and Missy told her to tell her mother. P.L.R. stated that she was afraid to tell her mother. She also stated that she told the son of her mother's next-door neighbor, who was the same age as B.J.R. P.L.R. testified that "at the very end" when her mother "first left [the Defendant]," she told her cousin, Tina what had being going on. P.L.R. maintained that she did not tell an adult before telling Tina because she was "afraid that no one would believe [her], and that [the Defendant] would make it worse, because he said he would if [she] ever told." According to P.L.R., the Defendant said that nobody would believe her.

On cross-examination, P.L.R. testified that she could not remember talking about the "agreement for second chance" that her family made when the Defendant moved back into the home. She stated that she was twelve years old at the time. P.L.R. testified that she did not remember signing the document, but acknowledged that her signature was on it. P.L.R. also acknowledged that she wrote a card "To mom and dad" and gave the card to her mother and the Defendant.

The Defendant testified that at the time of trial, he was thirty-seven years old. He maintained that he did not have unlawful sexual contact with his stepdaughters. The Defendant testified that he met Vivian Brooks in November 1987 when he fixed her car. The Defendant stated that he moved in with Brooks and her two daughters in 1987. He testified that he and Brooks got married in January 1990 and that Brooks was pregnant with their son at the time of the marriage.

The Defendant testified that when his wife and stepdaughters went to Maryland in 1992 for two weeks, he called and talked to his wife and his stepdaughters. However, he stated that the girls never told him that they did not want to come back. The Defendant also reported that while he was in Chicago in 1993 for two weeks for work, he called his family every other day and that he talked to everybody on the phone.

The Defendant stated that he moved out in 1994. He testified that in February 1995, he, his wife and his stepdaughters "sat down, went over a list of things that everybody wrote down, the problems that was going on in the house . . . and . . . [everyone] come up to an agreement. Vivian [Brooks] wrote the agreement out, and [everybody] signed it." The Defendant reported that he requested the portion of the document that stated that Vivian Brooks "will not work nights or overnight."

The Defendant testified that discipline in the household "was administered by belt or by hand." He also stated that the children might be sent to their rooms and that phone privileges might be revoked. The Defendant maintained that he never gave the victims the choice of being spanked or sucking on his penis. The Defendant admitted that in a prior proceeding, he lied and said that he

did not use a belt to discipline his stepdaughters. The Defendant testified that because of the hours that he and his wife worked, they did not have much time together to be intimate.

According to the Defendant, Vivian Brooks told him in March 1996 that she wanted to have an "open marriage" and told him that he could see other women as long as he did "not bring them around the house and the children." The Defendant testified that he responded, "Hell no," told his wife that he wanted a divorce, and told her that he was going to take his son with him. The Defendant recalled that in April 1996, he received a call from Investigator Cindy Gass of the Knoxville City Police Department. The Defendant testified that Investigator Gass told him that his stepdaughters had made allegations against him. The Defendant acknowledged that when he was first investigated regarding the sexual abuse allegations, Investigator Gass asked him what the victims' motives might have been in accusing him of sexual abuse, and the Defendant replied that he did not know. The Defendant also acknowledged that he never told Investigator Gass that his wife wanted an open marriage.

Although the Defendant stated that Vivian Brooks was trying to keep him from seeing his son, he admitted that he was allowed to visit his son at Parent Place, but did not do so. The Defendant testified that he did not visit his son for three years because his son felt uncomfortable at Parent Place. The Defendant testified that the last time he saw his son was Christmas 1998.

The Defendant's mother, Joyce McWaters, testified that the victims "loved" the Defendant and that they did not ever appear to be "uneasy" around him. She stated that she was not around the Defendant and his family all of the time.

## II. ANALYSIS

### A. Motion to Sever Offenses

The Defendant argues that the trial court erred by denying his motion to sever the offenses in this case. A trial court's denial of a motion for severance will be reversed only when there has been an abuse of discretion. State v. Shirley, 6 S.W.3d 243, 247 (Tenn. 1999). This Court will not interfere with the exercise of this discretion unless it appears on the face of the record that the accused was prejudiced by the trial court's ruling. State v. Wiseman, 643 S.W.2d 354, 362 (Tenn. Crim. App. 1982). Whether severance should be granted "depends upon the facts and circumstances involved in the various crimes that are charged." State v. Morris, 788 S.W.2d 820, 822 (Tenn. Crim. App. 1990).

Rule 14 of the Tennessee Rules of Criminal Procedure provides as follows: "If two or more offenses have been joined or consolidated for trial . . ., the defendant shall have a right to a severance of the offenses unless the offenses are part of a common scheme or plan and the evidence of one would be admissible upon the trial of the others." Tenn. R. Crim. P. 14(b)(1). To avoid severance, both portions of the rule must be satisfied. See State v. Hallock, 875 S.W.2d 285, 289 (Tenn. Crim. App. 1993).

The first prong of Rule 14(b)(1) of the Tennessee Rules of Criminal Procedure requires that the trial court find a common scheme or plan. In Tennessee, there are three categories of common scheme or plan evidence: (1) evidence showing a distinctive design or signature crime; (2) evidence demonstrating a larger, continuing plan or conspiracy; and (3) evidence that the offenses are part of the same transaction. State v. Moore, 6 S.W.3d 235, 240 (Tenn. 1999). "Before multiple offenses may be said to reveal a distinctive design, . . . the 'modus operandi employed must be so unique and distinctive as to be like a signature.'" Id. (citing State v. Carter, 714 S.W.2d 241, 245 (Tenn. 1986)).

> However, the Tennessee Supreme Court has noted that
> "the mere existence of a common scheme or plan is not a proper justification for admitting evidence of other crimes. Rather, admission of evidence of other crimes which tends to show a common scheme or plan is proper to show identity, guilty knowledge, intent, motive, to rebut a defense of mistake or accident, or to establish some other relevant issue. Unless expressly tied to a relevant issue, evidence of a common scheme or plan can only serve to encourage the jury to conclude that since the defendant committed the other crime, he also committed the crime charged."

Id. at 239 n.5 (quoting State v. Hallock, 875 S.W.2d 285, 292 (Tenn. Crim. App. 1993)). The court has also stated that "a common scheme or plan for severance purposes is the same as a common scheme or plan for evidentiary purposes." Id. at 240 n.7. Thus, Tennessee Rule of Evidence 404(b) is also relevant to our analysis of this issue. See State v. McCary, 922 S.W.2d 511, 513-14 (Tenn. 1996).

The crimes in this case can be construed as being part of a common scheme or plan in that the evidence shows a distinctive design. The Defendant used the same procedures to victimize each of his stepdaughters. Both victims testified that the Defendant initially asked if they wanted to see something and then he showed them his penis. Both victims testified that the Defendant often waited until his wife left for work, and then he went into the victims' rooms and presented them with the choice of being spanked or performing fellatio on him. Both victims testified on these occasions that the Defendant stuck his penis in their mouths and then ejaculated into a hand towel that he brought with him.

The second prong of Rule 14(b)(1) of the Tennessee Rules of Criminal Procedure requires that the evidence of each of the offenses be admissible at the trial of the other. Evidence that the accused committed crimes independent of those for which he is on trial is generally inadmissible because such evidence lacks relevance and invites the finder of fact to infer guilt from propensity. Moore, 6 S.W.3d at 239; see also Tenn. R. Evid. 404(b). However, evidence of other crimes, wrongs, or acts may be admissible for other purposes. Moore, 6 S.W.3d at 239. The "primary inquiry" in any severance case is whether the evidence of one offense would be admissible in the trial of the other if the two offenses remained severed. State v. Burchfield, 664 S.W.2d 284, 286 (Tenn. 1984).

In this case, we cannot conclude that the evidence of the crimes against one of the victims "would be admissible upon the trial of the others," Tenn. R. Crim. P. 14(b)(1), to establish some other relevant issue. Although offenses that are part of a common scheme or plan are typically

offered to establish the identity of the perpetrator, Moore, 6 S.W.3d at 239; McCary, 922 S.W.2d at 514, identity is not a material issue in this case. Nor do we find that the evidence is admissible to establish some other relevant issue. Both victims testified that the Defendant made comments to each of them about the other one. B.J.R. stated that the Defendant would make comments such as, "You are better than your sister." P.L.R. testified that the Defendant told her that he was doing the same thing to her sister and that her sister was better. However, we conclude that such statements are not sufficient to establish some other relevant issue. We therefore conclude that the trial court erred by consolidating the cases for trial.

Nevertheless, we must also decide whether or not the error was harmless. Rule 52(a) of the Tennessee Rules of Criminal Procedure provides that "[n]o judgment of conviction shall be reversed on appeal except for errors which affirmatively appear to have affected the result of the trial on the merits." "In most severance cases, 'the line between harmless and prejudicial error is in direct proportion to the degree . . . by which proof exceeds the standard required to convict . . . .'" Spicer v. State, 12 S.W.3d 438, 447 (Tenn. 2000) (quoting Delk v. State, 590 S.W.2d 435, 442 (Tenn. 1979)). In Spicer, a case involving sexual offenses against two minors, our supreme court held that consolidation was harmful because the only evidence supporting the child rape conviction was the victim's testimony and medical testimony that the victim appeared to have been sexually penetrated multiple times. Id. at 448; cf. State v. Hallock, 875 S.W.2d 285, 292 (holding that failure to sever offenses was harmless in light of overwhelming proof of guilt, including the defendant's confession). The court noted that "joinder of open-dated indictments involving multiple victims is usually prejudicial because State v. Rickman[, 876 S.W.2d 824 (Tenn. 1994),] seems to allow the jury to hear evidence of countless sexual episodes from each of the different victims." Spicer, 12 S.W.3d at 448. Although stopping short of holding that consolidation in sex offense cases involving open ended indictments and multiple victims is inherently prejudicial, the court observed that in most cases, "a real probability exists" that the jury will base the convictions upon the defendant's propensity to commit sexual crimes. Id.

Like those in Spicer, the presentments in this case are open-dated, and the evidence of fellatio came solely from the victims' testimony. However, this case is unlike Spicer in that the State presented no medical evidence but, instead, called the victims' mother regarding the Defendant's having opportunity to commit the offenses while she was at work. The victims were vigorously cross-examined about their failure to tell anyone about the sexual abuse despite opportunities when the Defendant was working out of town and when the victims accompanied their mother to Maryland. The Defendant denied the allegations of sexual abuse and intimated that the victims' mother invented the allegations. Although we believe the evidence is sufficient for each of the convictions, we do not believe it is overwhelming.

The victims' testimony regarding numerous uncharged instances of fellatio raises the specter of the jury relying upon propensity evidence for the convictions. In Spicer, the court noted that the victims testified to numerous instances of sexual abuse, including instances not related to the offenses that the state elected, and concluded:

> It is unlikely that the jury was not influenced by the perceived propensity of the appellant to sexually abuse his step-daughters, or that the testimony from each of the victims was not bolstered by the same type of testimony coming from the other. This perceived propensity combined with less than abundant evidence of rape leads us to conclude that the consolidation error affirmatively affected the outcome of the trial.

Id. We reach a similar conclusion in the present case. Therefore, we reverse the convictions, sever the offenses by victim, and remand the cases for new trials. In the event of further review, we will briefly address the other issues raised by the Defendant.

## B. Sufficiency of the Evidence

The Defendant argues that insufficient evidence was presented at trial to convict him of the charged offenses. When an accused challenges the sufficiency of the evidence, an appellate court's standard of review is whether, after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); Jackson v. Virginia, 443 U.S. 307, 324 (1979); State v. Duncan, 698 S.W.2d 63, 67 (Tenn. 1985). This rule applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999).

In determining the sufficiency of the evidence, this Court should not re-weigh or re-evaluate the evidence. State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. State v. Buggs, 995 S.W.2d 102, 105 (Tenn. 1999); Liakas v. State, 286 S.W.2d 856, 859 (Tenn. 1956). Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. Liakas, 286 S.W.2d at 859. This Court must afford the State of Tennessee the strongest legitimate view of the evidence contained in the record, as well as all reasonable inferences which may be drawn from the evidence. State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. Id.

Sufficient evidence was presented in this case to convict the Defendant of three counts of rape of a child and two counts of rape. Both victims testified that the Defendant often found some "excuse" to come into their rooms after their mother had left for work and punish them. The victims testified that the Defendant gave them a choice of a getting a spanking or performing fellatio on him. The Defendant claimed that the victims made these allegations only because he wanted to get a divorce from his wife and obtain full custody of his son. However, the jury obviously credited the testimony of the victims over that of the Defendant. This issue is without merit.

-10-

## C. Cumulative Errors

The Defendant argues that the "culmination of errors in these proceedings operated in such a manner to deprive [him] of a fair trial and due process of law." As we have concluded that the trial court's denial of a severance was prejudicial error requiring reversal, this issue is now effectively a moot one.

For the reasons stated in this opinion, the judgments of the trial court are REVERSED, the offenses are severed by victim, and the case is REMANDED for new trials.

_____
ROBERT W. WEDEMEYER, JUDGE